PETERMAN v DEPARTMENT OF NATURAL RESOURCES

Docket No. 95972. Argued March 8, 1994 (Calendar No. 2). Decided
   August 23, 1994.

Robert L. and Gail O. Peterman brought an action in the Court of
   Claims against the Department of Natural Resources, alleging
   that filtration of sand from Grand Traverse Bay for the con-
   struction of a boat launch and jetties by the DNR caused the
   destruction of their beachfront property and was a nuisance
   and a taking without just compensation. Following a bench
   trial, the court, James T. Kallman, J., found that the jetties
   proximately caused the erosion of the shoreline by diverting
   sand from its natural path and that the DNR's unscientific
   construction and design of the launch contributed to the loss of
   property and awarded damages to the plaintiffs. The Court of
   Appeals, DOCTOROFF, C.J., and MICHAEL J. KELLY and R. B.
   BURNS, JJ., reversed in an unpublished opinion per curiam,
   finding that diversion of sand from the plaintiffs' land did not
   constitute a trespass-nuisance and that because the trial court
   failed to decide whether there was a taking, the issue was not
   preserved for appeal (Docket No. 117895). The plaintiffs appeal.

   In an opinion by Justice RILEY, joined by Justices LEVIN,
   BRICKLEY and MALLETT, the Supreme Court held:

   While compensation usually is not necessary for the erosion
   of beach under the high-water mark caused by navigational
   improvements by the state, compensation is due for the de-
   struction of the plaintiffs' fast lands. Moreover, because the
   Department of Natural Resources' unscientific construction of
   the boat launch unnecessarily caused the destruction of the
   plaintiffs' beach, compensation must be awarded for its loss.
   Filtration of sand by the DNR from a bay that leads to the
   erosion of fast land does not fall within the trespass-nuisance
   exception to sovereign immunity.

   1. Absent unusual circumstances, issues not raised at trial

REFERENCES

Am Jur 2d, Eminent Domain §§ 23, 53, 157, 159, 162, 166, 171, 189,
   190, 481.

Supreme Court's views as to what constitutes "taking," within
   meaning of Fifth Amendment's prohibition against taking of
   private property for public use without just compensation. 89 L
   Ed 2d 977.

may not be raised on appeal. In this case, the plaintiffs raised the issue of unconstitutional taking in the trial court and pursued it on appeal. Because of the interrelated nature of the plaintiffs' claims, the trial court appears to have merged the causes of action. It awarded damages on the basis of the lost value of the plaintiffs' land, the appropriate award in a taking action. While not labeling the cause of action specifically, the court appears to have ruled on the claim. Even assuming arguendo that the trial court failed to so rule, the plaintiffs should not be punished for the omission. Thus, the issue is properly before the Supreme Court.

2. Riparian rights are protected by limits of the power of eminent domain and are not absolute; rather, they are subject to the navigational servitude retained by the state. Title to riparian property is held subordinate to the public's right to navigate and the state's authority to improve navigation. However, although the state may act to improve navigation, it does not in the process have the power to condemn all property without compensation. The limit of the public's right is the ordinary high-water mark. The ownership of fast land is unqualified and not burdened with a public right, and when fast lands are taken, just compensation must be paid. In this case, fast lands as well as the shoreline were taken as a consequence of the DNR's actions, and its failure to comply with condemnation proceedings and compensate the plaintiffs for their losses constituted an unconstitutional taking of property without due process and just compensation.

3. To legitimately exercise the power of eminent domain, the government actually must need to take the property. There must be an essential nexus between the taking and a legitimate state interest and a rough proportionality between the manner of the taking and the actual state interest. In this case, no essential nexus existed between the construction of the boat launch and the destruction of the plaintiffs' beach. The taking of the property served no public interest because the launch could have been built without destroying the plaintiffs' property.

4. The trespass-nuisance exception to governmental immunity is distinct from a taking. Thus, damages awarded for a trespass nuisance might not necessarily mirror or be incorporated within the damages awarded for taking property. In this case, however, there was no trespass. By definition, the extraction of sand from the water was not an invasion of the plaintiffs' property. Thus, the DNR's action cannot constitute a trespass-nuisance.

Justice BOYLE, joined by Chief Justice CAVANAGH, concurred,

except with respect to the discussion in part III(A) regarding Const 1963, art 10, § 2.

Affirmed in part and reversed in part.

Justice GRIFFIN, concurring in part and dissenting in part, stated that while the plaintiffs hold legal title to their fast land, legal title to their subaqueous (nonfast) land is held by the state in trust for the people. Riparian owners' rights are subordinate to the public's right to navigate and the state's authority to improve navigation. Thus, damages to riparian properties arising from navigational improvements often are not compensable takings.

In this case, the plaintiffs are not entitled to compensation under the Fifth Amendment of the United States Constitution for erosion of their nonfast beach. Nor are they entitled to compensation under the Michigan Constitution because the state's action that resulted in the erosion of their nonfast land had a real and substantial relation to the improvement of navigation.

1. CONSTITUTIONAL LAW — TAKING CLAUSE — RIPARIAN RIGHTS — FAST LAND — IMPROVEMENTS TO NAVIGATION.

　While compensation usually is not necessary for the erosion of beach under the high-water mark caused by navigational improvements by the state, compensation is due for the destruction of fast lands.

2. GOVERNMENTAL IMMUNITY — TRESPASS-NUISANCE EXCEPTION — EXTRACTION OF SAND.

　Filtration of sand by the Department of Natural Resources from a bay for the purpose of improving navigation that leads to the erosion of fast land does not fall within the trespass-nuisance exception to sovereign immunity.

3. EMINENT DOMAIN — TAKING — LEGITIMATE STATE INTEREST — ESSENTIAL NEXUS.

　To legitimately exercise the power of eminent domain, the government actually must need to take the property; there must be an essential nexus between the taking and a legitimate state interest and a rough proportionality between the manner of the taking and the actual state interest.

*Philip A. Clancey & Associates, P.C.* (by *Philip A. Clancey*), and *Thomas J. Dignan,* for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Thomas L.*

*Casey,* Solicitor General, *A. Michael Leffler,* Assistant in Charge, and *Gary L. Hicks,* Assistant Attorney General, for the defendant.

RILEY, J. In the instant case, we are presented with the scope of the constitutional guarantee that property shall not be taken by the state for public purposes without due process and just compensation. More specifically, we must determine whether the Department of Natural Resources must compensate property owners for the destruction of beachfront property caused by the filtration of sand from the water because of the construction of a boat launch. We hold that while compensation is usually not necessary for the erosion of beach under the high-water mark caused by navigational improvements by the state, compensation is due for the destruction of plaintiffs' fast lands. Moreover, because defendant's unscientific construction of the boat launch unnecessarily caused the destruction of plaintiffs' beach, compensation must be awarded for the loss of the beach. Furthermore, we are presented with the scope of the trespass-nuisance exception to sovereign immunity. We hold that the filtration of sand *from* a bay that leads to the erosion of fast land does not fall within the exception. Hence, we reverse the judgment of the Court of Appeals in part and reinstate the damages awarded by the trial court.

I

In 1979, plaintiffs Robert and Gail Peterman purchased a parcel of lakefront property on the Old Mission Peninsula.[1] By early 1980, they had constructed a house on the property. An attractive

---

[1] For those with a cartographer's penchant for perfection, the peninsula is located on the eastern arm of Grand Traverse Bay, approximately four miles north of Traverse City.

feature of the property was its fifteen to twenty-foot-wide sandy beachfront. Despite plaintiffs' protests, during the spring and summer of 1980, defendant Michigan Department of Natural Resources constructed a boat-launch ramp on its property approximately thirty feet north of plaintiffs' property.[2] To prevent the buildup of sand on the launch, facilitate boat launching, reduce ice damage to the ramp, and dissipate energy from waves, defendant installed jetties extending thirty feet into the bay on both sides of the ramp.[3]

The jetties apparently worked so well that by August of the next year plaintiffs' beach had virtually disappeared. By October, plaintiffs had lost not only the beach, but a large tree, grass, and other fast land.[4] Meanwhile, the jetties accumulated hundreds of cubic yards of sand. Despite defendant's consistent removal of the sand collected on the jetties, defendant refused to replenish plaintiffs' shoreline. Plaintiffs eventually built a sea wall to prevent further erosion of their property.

Meanwhile, plaintiffs filed suit in the Court of Claims in October 1981. Plaintiffs' amended complaint alleged intentional trespass, intentional damage, intentional interference with use of their property, nuisance, and a taking without just compensation.[5] Following a bench trial, the court found that defendant's jetties proximately caused the erosion of the shoreline by diverting sand from

[2] While defendant owned several hundred feet of bayfront property, it refused to select an alternative site.

[3] The jetties were composed of large stone piles.

[4] Fast land is property that is "above the high-water mark of " the stream, river, or other body of water that abuts the property. 26 Am Jur 2d, Eminent Domain, § 192, p 873.

[5] Plaintiffs also alleged that the heavy machinery utilized during the construction of the launch damaged their home. The trial court found that the damage was not proximately caused by the construction, and that issue is not before this Court.

its natural path in the littoral drift by collecting it on the jetties. The court found that the north to south littoral drift, i.e., the natural flow of water and sand, would have replenished plaintiffs' shoreline absent the construction of the jetties and that the deprivation of the sand led to the property's erosion. The court also found that defendant's unscientific construction and design of the launch contributed to the loss of the property.[6] The court awarded $35,000 in damages, finding that amount to be the loss of the property's value due to the shoreline's erosion.

The Court of Appeals reversed,[7] finding that because the "sand was diverted *from* plaintiffs' land," the "facts do not constitute a 'trespass-nuisance.'" The Court held that the trial court failed to decide whether there was a taking and that the issue, therefore, was not preserved for appeal.

This Court granted leave to appeal.[8]

II

The Court of Appeals held that because the trial

---

[6]   This Court finds the devastation of the Plaintiff's beach front property was directly and proximately caused by the placement of the groins/jetties, the improper and unscientific construction and design of the groins/jetties in violation of the Army Corp of Engineers guidebook, and the continuous removal of the sand from between the groins/jetties which compounded the interruption and prevention of any littoral drift of sand to nourish the Plaintiff's beach front property. The voluminous photographic exhibits submitted by both parties indicate a substantial erosion which occurred subsequent to the installation of the groins/jetties by the DNR in the fall of 1980. This Court finds the Plaintiff's beach erosion and the presence of cobbles, stones and rocks which are distinctly present only at the Plaintiff's property adjacent to the DNR launch site is compelling evidence that the groins/jetties are the proximate cause of said erosion.

[7] Unpublished opinion per curiam of the Court of Appeals, issued June 17, 1992 (Docket No. 117895), slip op at 2.

[8] 444 Mich 863 (1993).

court failed to rule whether plaintiffs' property was unconstitutionally taken, the issue was not preserved for appellate review. Yet, the trial court awarded damages on the basis of the lost value of plaintiffs' land, which is the appropriate award for a taking action. While not labeling the cause of action specifically, the court appeared to have ruled on the claim.

In any event, assuming, arguendo, that the trial court failed to rule on the issue, plaintiffs should not be punished for the omission of the trial court. The Court of Appeals cited *Joe Dwyer, Inc v Jaguar Cars, Inc,* 167 Mich App 672, 685; 423 NW2d 311 (1988), for the proposition that issues undecided by the trial court are not preserved for appeal. Yet, *Dwyer* involved a case in which the plaintiff failed to properly raise before the trial court the issue contested on appeal. Thus, *Dwyer* simply reiterates the time-honored rule that, absent unusual circumstances, issues not raised at trial may not be raised on appeal. See, e.g., *Franklin Mining Co v Harris,* 24 Mich 115, 117 (1871); *In re Forfeiture of Certain Personal Property,* 441 Mich 77, 84; 490 NW2d 322 (1992).

In the instant case, plaintiffs raised the issue below and pursued it on appeal. Thus, the issue is appropriately before this Court. Because of the interrelated nature of plaintiffs' claims, the trial judge appeared to merge the two causes of action. The Court of Appeals could have addressed this problem by remanding the case for a separation of the actions or examining the actions separately itself. In the interest of judicial economy,[9] we address the major issues presented.

---

[9] See MCR 7.316.

III

A

Plaintiffs allege that defendant's actions constitute an unconstitutional taking of property without due process of law and without just compensation. Const 1963, art 10, § 2 provides: "Private property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law."[10] In other words, "it can never be lawful to compel any man to give up his property, when it is not needed, or to lose it, whether needed or not, without being made whole." *Paul v Detroit,* 32 Mich 108, 119 (1875).

The primary source for ascertaining the meaning of a constitutional provision is to determine its plain meaning as understood by its ratifiers at the time of its adoption. *Kearney v Bd of State Auditors,* 189 Mich 666, 671; 155 NW 510 (1915).[11] This is so because "[t]he constitution, although drawn up by a convention, derives no vitality from its framers, but depends for its force entirely upon the popular vote." *People v Blodgett,* 13 Mich 127, 141 (1865) (Campbell, J.).

Nevertheless, "to clarify meaning, the circum-

[10] Similarly, the Fifth Amendment of the United States Constitution provides: "nor shall private property be taken for public use, without just compensation." The federal guarantee is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Electro-Tech v H F Campbell Co,* 433 Mich 57, 67, n 11; 445 NW2d 61 (1989). See also *Chicago, B & Q R Co v Chicago,* 166 US 226; 17 S Ct 581; 41 L Ed 979 (1897). Because the federal guarantee is no more protective than the state guarantee in the instant case, we do not examine the provision separately.

[11] Generally, this intent is to be gleaned from the natural and obvious meaning of the text, and "further examination, with a view to find some other and more subtle meaning, ought to be made with extreme caution, lest we deceive ourselves into disregarding the plain and obvious sense for some other, which only ingenuity discovers and suggests." *People v Blodgett,* 13 Mich 127, 167 (1865) (Cooley, J.).

stances surrounding the adoption of a constitu-
tional provision and the purpose sought to be
accomplished may be considered." *Traverse City
School Dist v Attorney General,* 384 Mich 390,
405; 185 NW2d 9 (1971), citing Cooley, Constitu-
tional Limitations (6th ed), p 81. This Court cannot
properly protect the mandate of the people with-
out examining both the origin and purpose of a
constitutional provision, because provisions
stripped of their context may be manipulated and
distorted into unintended meanings. *Lockwood v
Comm'r of Revenue,* 357 Mich 517, 557; 98 NW2d
753 (1959). Indeed, we must heed the intentions of
the ratifiers because our constitution gains its
authority from its ratification by the people—to do
otherwise deprives them of the right to govern.
See, e.g., *Carmen v Secretary of State,* 384 Mich
443, 452; 185 NW2d 1 (1971).[12]

B

"[E]ach State by virtue of its statehood has the
right to exercise the power of eminent domain."
*Loomis v Hartz,* 165 Mich 662, 665; 131 NW 85
(1911). Justice COOLEY explained the origin of this
power:

The eminent domain may be said to be the

---

[12] Justice POTTER explained:

Changing by judicial construction the settled meaning of
words aptly used in the Constitution is more than the exercise
of legislative power. It wrests private rights from their moor-
ings, lets down constitutional barriers, and alters the founda-
tion of government.

If the Constitution is wrong it may be amended, but so long
as it remains unamended courts are to construe its language
now to mean what it plainly meant when used by those who
framed and adopted it. [*James S Holden Co v Connor,* 257 Mich
580, 600; 241 NW 915 (1932).]

rightful authority which exists in every sover-
eignty, to control and regulate those rights of a
public nature which pertain to its citizens in com-
mon, and to appropriate and control individual
property for the public benefit, as the public
safety, necessity, convenience and welfare may
demand. The authority springs from no contract or
arrangement between the government and the
citizen whose property may be appropriated, but it
has its foundation in the imperative law of neces-
sity, and is recognized, and may be defended and
enforced, upon the ground that no government
could perpetuate its existence and further the
prosperity of its people, if the means for the exer-
cise of any of its sovereign powers might be with-
held at the option of individuals. [*People ex rel
Trombley v Humphrey,* 23 Mich 471, 474 (1871).][13]

From its very existence as a territory, Michigan
has recognized that while exercising the power of
eminent domain, the state may not deprive an
individual "of his property without due process of
law, and without compensation." *Stock v Jefferson
Twp,* 114 Mich 357, 362; 72 NW 132 (1897). The
provision, therefore, is one that has "acquired a
well-understood meaning, which the people must
be supposed to have had in view in adopting them.
We cannot understand these provisions unless we
understand their history; and when we find them
expressed in technical words, and words of art, we
must suppose these words to be employed in their
technical sense." 1 Cooley, Constitutional Limita-
tions (8th ed), p 132.

As Justice Cooley explained, the purpose and

[13] The states of this Union possess the eminent domain for all
legitimate purposes under their own sovereignty. They may
take and appropriate lands for roads, canals, state-houses,
court-houses, school-houses and many other purposes needful to
enable them to accomplish the objects for which their govern-
ments have been created by their people. [*Id.* at 475.]

history undergirding the provision[14] inherently limits the power of eminent domain:

> The right being thus found to rest upon necessity, the power to appropriate in any case must be justified and limited by the necessity . . . . Any employment of the power for other purposes than to enable the government to exercise and give effect to its proper authority, effectuate the purpose of its creation and carry out the policy of its laws, could not be rested upon the justification and basis which underlie the power, and consequently would be wholly unauthorized and inadmissible. [*Humphrey, supra* at 474-475.]

Thus, the state may never "take property under pretense of public benefit, which is not needed by the public, however much it may advance interests in which the public have no concern . . . ." *Paul, supra* at 119. See also *Poletown Neighborhood Council v Detroit,* 410 Mich 616, 670; 304 NW2d 455 (1981) (RYAN, J., dissenting).

Furthermore, to ensure the protections of this guarantee, the State of Michigan recognizes a cause of action, often referred to as an inverse or

---

[14] Before the American Revolution and the drafting of the United States Constitution, the sovereign was not only empowered to take private property for public use, but such takings were almost always uncompensated. See, e.g., Treanor, *The origins and original significance of the Just Compensation Clause of the Fifth Amendment,* 94 Yale L J 694, 695-701 (1985). Nevertheless, the newly formed republic became increasingly hostile to governmental infringement of property rights as states seized loyalist lands, suspended or remitted debts and the collection of taxes, printed inflationary paper money, and delayed legal enforcement of property rights. To address these abuses was born the requirement that government may not take private property for public use without just compensation. The principle was first introduced into our law at the federal level in the Northwest Ordinance of 1787, and was ratified along with the Bill of Rights in the Fifth Amendment in 1791. The principle, therefore, is "as much a part of the Bill of Rights as the First Amendment or Fourth Amendment" and the property rights protected by it should be protected accordingly. *Dolan v City of Tigard,* 512 US —, —; 114 S Ct 2309, 2320; 129 L Ed 2d 304 (1994).

reverse condemnation suit, for a de facto taking when the state fails to utilize the appropriate legal mechanisms to condemn property for public use.[15] See, e.g., *Hart v Detroit,* 416 Mich 488; 331 NW2d 438 (1982). The instant case is such an action.

C

At issue is the erosion of plaintiffs' beachfront property because of the construction of a boat launch and jetties that altered the littoral drift of the current thereby depriving plaintiffs' property of the sand that had previously nourished and replenished it. Defendant contends that because it never actually invaded plaintiffs' property, its destruction is not embraced within the Taking Clause. In other words, defendant contends that its actions did not unconstitutionally take plaintiffs' property because the erosion of the beachfront was an indirect consequence of defendant's actions. In fact, this Court has noted that " '[a]ny proper exercise of the powers of government, which does not directly encroach upon the property of an individual, or disturb him in its possession or enjoyment, will not entitle him to compensation, or give him a right of action.' " *Vanderlip v Grand Rapids,* 73 Mich 522, 535; 41 NW 677 (1889), quoting Cooley, Constitutional Limitations (5th ed), p 671. Nevertheless, to ensure that the purpose of the provision is protected, this Court is reluctant to relieve the government of its duty to compensate a property owner unless the destruction of property is "too remote, trivial or uncertain" to deprive a claim of merit. *Grand Rapids Booming Co v Jarvis,* 30 Mich 308, 325 (1874).

Furthermore, because " '[t]he constitutional provision is adopted for the protection of and security

---

[15] MCL 213.1 *et seq.;* MSA 8.1 *et seq.*

to the rights of the individual as against the government,' . . . the term 'taking' should not be used in an unreasonable or narrow sense." *Pearsall v Eaton Co Bd of Supervisors,* 74 Mich 558, 561; 42 NW 77 (1889). Hence, this Court has long held that "[t]he right of exclusion or the right of complete possession and enjoyment is one of the essential elements of property in land." *Vanderlip, supra* at 533.[16] Thus, a physical intrusion on the property itself is not required for a "taking" to have occurred. See, e.g., *Thom v State Hwy Comm'r,* 376 Mich 608; 138 NW2d 322 (1965); *Bott v Natural Resources Comm,* 415 Mich 45, 81, n 43; 327 NW2d 838 (1982). As Justice CAMPBELL explained for the Court, to deprive a property owner of enjoyment of property " 'is to deprive him of the property itself, wholly or to the extent of the mischief.' " *Vanderlip, supra* at 537, quoting *Koopman v Blodgett,* 70 Mich 610, 619; 38 NW 649 (1888). See also *Electro-Tech v H F Campbell Co,* 433 Mich 57, 88-89; 445 NW2d 61 (1989).

Taking has been found, therefore, when the state has eliminated access to property, *Ranson v Sault Ste Marie,* 143 Mich 661, 670-671; 107 NW 439 (1906); *Big Rapids v Big Rapids Furniture Mfg Co,* 210 Mich 158, 175; 177 NW 284 (1920), or made the usual access to plaintiffs' land very difficult. *Thom, supra* at 627 (SOURIS, J.). Similarly, damage to property caused by a nearby nuisance maintained by the state is compensable, *Buckeye Union Fire Ins Co v Michigan,* 383 Mich 630; 178 NW2d 476 (1970), as are damages arising from the removal of "lateral support of adjacent grounds to

---

[16] Accordingly, " ' "where real estate is actually invaded by superinduced water, earth, sand or other material, . . . it is a taking within the meaning of the Constitution." ' " *Herro v Chippewa Co Rd Comm'rs,* 368 Mich 263, 275; 118 NW2d 271 (1962), quoting *Jarvis, supra* at 324, quoting *Pumpelly v Green Bay Co,* 80 US (13 Wall) 166, 181; 20 L Ed 557 (1872).

the injury of their owners." *Buskirk v Strickland,*
47 Mich 389, 391-392; 11 NW 210 (1882). In fact,
inverse condemnation may occur even without a
physical taking of property, where the effect of a
governmental regulation is "to prevent the use of
much of plaintiffs' property . . . for any profitable
purpose." *Grand Trunk W R Co v Detroit,* 326
Mich 387, 392-393; 40 NW2d 195 (1949).[17]

In short,

> " '[a]ny injury to the property of an individual
> which deprives the owner of the ordinary use of it
> is equivalent to a taking, and entitles him to
> compensation. So a partial destruction or diminu-
> tion of value of property by an act of government,
> which directly and not merely incidentally affects
> it, is to that extent an appropriation.' " [*Vanderlip,
> supra* at 534, quoting *Broadwell v City of Kansas,*
> 75 Mo 213, 218 (1881).][18]

[17] See also *Pennsylvania Coal Co v Mahon,* 260 US 393, 415; 43 S Ct
158; 67 L Ed 322 (1922) ("while property may be regulated to a
certain extent, if regulation goes too far it will be recognized as a
taking"); *Lucas v South Carolina Coastal Council,* 505 US —; 112 S Ct
2886, 2892-2895; 120 L Ed 2d 798 (1992).

After all, "[t]he police power of the Legislature in this State is not
omnipotent. It cannot, under the guise of regulation, destroy property
rights arbitrarily and without reason." *Grand Rapids v Powers,* 89
Mich 94, 113; 50 NW 661 (1891). The concerns of these cases appear
rooted in the longstanding requirement that a public necessity must
exist before the power of eminent domain may be legitimately exer-
cised. See, e.g., *Humphrey, supra* at 474-475; *Paul, supra* at 119.
Hence, the governmental regulation of property must not only possess
an essential nexus to a legitimate state interest, but the government
must show particularized findings that "rough proportionality" exists
between the legislative goal and the actual regulations. *Dolan,* n 14
*supra,* 114 S Ct 2319. While "[n]o precise mathematical calculation is
required, [the governmental entity] must make some sort of individu-
alized determination that the [regulation] is related both in nature
and extent to the impact of the" property's use or proposed use. *Id.,*
114 S Ct 2319-2320.

[18] Often, a reduction in value caused by government action is a
strong indication of a "taking." See, e.g., *In re Urban Renewal,
Elmwood Park Project,* 376 Mich 311; 136 NW2d 896 (1965) (caused
by an urban renewal project); *Grand Trunk W R Co v Detroit, supra*
(caused by zoning).

In the instant case, the trial court found that defendant's actions were the proximate cause of the destruction of plaintiffs' beachfront property. Assuming that defendant did not directly invade plaintiffs' land, it undoubtedly set into motion the destructive forces that caused the erosion and eventual destruction of the property. Defendant was forewarned that the construction of the jetties could very well result in the washing away of plaintiffs' property, and the evidence reveals that the destruction of plaintiffs' property was the natural and direct result of the defendant's construction of the boat launch. The effect of defendant's actions were no less destructive than bulldozing the property into the bay. *Jarvis, supra* at 325 (finding that "consequential" damages were compensable because they were "as clearly the direct, natural and necessary result of the acts complained of, as would be the piling of logs or the erection of a house up on the same land"). Defendant, therefore, may not hide behind the shield of causation in the instant case.

D

Defendant, however, also contends that it need not compensate plaintiffs because its actions occurred to improve the navigation of the state's waterways.

1

This Court has long recognized "that 'riparian rights are property.' " *Bott, supra* at 80 (citation

omitted).[19] Normally, "riparian owners have a right to the enjoyment of the natural flow of the stream with no burden or hindrance imposed by artificial means." *Koopman, supra* at 616. Similarly, "[t]he riparian owner has the exclusive use of the bank and shore . . . ." *Hilt v Weber,* 252 Mich 198, 226; 233 NW 159 (1930). The general rule in Michigan regarding the ownership of the bed of a body of water has been noted by Professor Bartke:

> [T]he title to submerged lands under the Great Lakes and the straits connecting them, but not the rivers, is in the State of Michigan in trust for the people. On the other hand, the title to subaqueous land under all the other navigable waters, including the rivers connecting the Great Lakes, is in the riparian owners. [Bartke, *Navigability in Michigan in retrospect and prospect,* 16 Wayne L R 409, 421 (1970).]

Moreover, with regard to any riparian owner, this Court has long held that "the right to acquisitions to land, through accession or reliction, is itself one of the riparian rights." *Hilt, supra* at 218. Hence, the "title of the riparian owner follows the shore line under what has been graphically called 'a moveable freehold.' " *Id.* at 219.[20] The Court has elaborated:

> "Upon the subject of accretions, we understand the law to be that additions to the land of a littoral proprietor by the action of the water, which are so gradual as to be imperceptible, be-

[19] The basis of the riparian doctrine, and an indispensable requisite to it, is actual contact of the land with the water. [*Hilt v Weber,* 252 Mich 198, 218; 233 NW 159 (1930).]

[20] Accordingly, " 'where the land encroaches upon the water by gradual and imperceptible degrees, the accretion or alluvion belongs to the owner of the land . . . .' " *Id.*

come a part of the land, and belong to the owner of the land, but, when not so, they belong to the State. So, if, by the imperceptible accumulation of soil upon the shore of an island belonging to a grantee of the government, or by reliction, it should be enlarged, such person, and not the State, would be the owner; but if an island should first arise out of the water, and afterwards become connected to that of the private proprietor, it would not thereby become the property of such person, but would belong to the State." [*Id.* at 221, quoting *People v Warner,* 116 Mich 228, 239; 74 NW 705 (1898).][21]

As property, riparian rights are protected by limits of the power of eminent domain. *Ryan v Brown,* 18 Mich 196, 208 (1869); *Bott, supra* at 80-81. While it may be true that "public control of the lake shores is necessary to insure opportunity for pleasure and health of the citizens in vacation time, to work out the definite program to attract tourists begun by the State and promising financial gain to its residents, and to conserve natural advantages for coming generations," the state may do so only "by gift, negotiation, or, if necessary, condemnation. There is no duty, power, or function of the State, whatever its claimed or real benefits, which will justify it in taking private property without compensation." *Hilt, supra* at 224. See also *Garth Lumber & Shingle Co v Johnson,* 151 Mich 205, 208; 113 NW 591 (1908).

Nevertheless, riparian rights are not absolute. From the time Michigan was a territory, the public's interest in the navigable waters has been recognized. Hence, defendant correctly notes that plaintiffs' riparian rights are subject to the naviga-

[21] See also *Klais v Danowski,* 373 Mich 262, 279; 129 NW2d 414 (1964) ("owners of lands, bordering on the navigable waters thereof [Great Lakes], gain by what comes through accretions or reliction but do not lose by erosion or avulsion that which they own under the patent [of title]").

tional servitude retained by the State of Michigan.[22]

The State of Michigan holds in trust the navigable waters of the state in behalf of its citizens, and riparian owners hold "the right to use and enjoy" their riparian property "subject to the public right of navigation . . . ." *Hall v Alford,* 114 Mich 165, 167; 72 NW 137 (1897).[23] Hence, "[t]he public, through their proper authorities, have always the right to restrain any encroachments which may be injurious to the public right, and to compel the removal of any obstruction or impediment, as well as to punish the offender, to the same extent as if the bed of the lake were vested in the State." *Grand Rapids v Powers,* 89 Mich 94, 110; 50 NW 611 (1891). Furthermore, the state may enact certain measures in furtherance of this trust—including the fundamental power to improve the navigability of such waterways on behalf of recreation and commerce. See, e.g., *Nedtweg v Wallace (On Rehearing),* 237 Mich 14, 24-25; 211 NW 647 (1927) (SHARPE, J., concurring).

---

[22] It will be helpful to recall that Michigan was carved out of the Northwest Territory; that the Territory was ceded to the United States by Virginia; that the United States held this Territory in trust for future States to be created out of it; that the United States held the waters of navigable rivers and lakes and the soil under them in trust for the people, just as the British crown had formerly held them in trust for the public uses of navigation and fishery; that when Michigan entered the union of States she became vested with the same qualified title that the United States had; that these waters and the soil under them passed to the State in its sovereign capacity impressed with a perpetual trust to secure to the people their rights of navigation, fishing and fowling. [*Collins v Gerhardt,* 237 Mich 38, 45-46; 211 NW 115 (1926).]

See also *State v Venice of America Land Co,* 160 Mich 680; 125 NW 770 (1910); *Nedtweg v Wallace,* 237 Mich 14, 16-17; 211 NW 647 (1927).

[23] Whether a riparian owner on a lake or a river "[i]n both cases the ownership is equally qualified by, and subordinate to, the rights of the public." *Powers,* n 17 *supra* at 109.

Perhaps, more important for our purposes, damage to riparian properties arising from navigational improvements are often not compensable takings. This is so because the title of such property is held subordinate to the public's right to navigate and the state's authority to improve navigation. *Hilt, supra* at 225 ("Riparian rights are property, for the taking or destruction of which by the State compensation must be made, unless the use has a real and substantial relation to a paramount trust purpose"). In other words, riparian owners hold a limited title to their property that is subject to the power of the state to improve navigation. Thus, damages that would otherwise be compensable are not because they arose during the exercise of the state's authority to improve navigation. *Id.; Miramar Co v Santa Barbara,* 23 Cal 2d 170, 172-173; 143 P2d 1 (1943).

Our Court of Appeals has also observed that

> there has been a reluctance to award compensation in cases involving injury caused by activities in aid of navigation. This reluctance seems grounded on the enormous commercial importance of navigation coupled with the almost limitless consequences that may flow from navigational improvements. Courts have hesitated to award compensation lest the costs of navigational improvements become prohibitive and seriously impede commerce. [*Tamulion v State Waterways Comm,* 50 Mich App 60, 68; 212 NW2d 828 (1973).][24]

Furthermore, Michigan's power over navigation

---

[24] In other words, "[t]he navigational servitude is an expression of the notion that the determination whether a taking has occurred must take into consideration the important public interest in the flow of interstate waters that in their natural condition are in fact capable of supporting public navigation." *Kaiser Aetna v United States,* 444 US 164, 175; 100 S Ct 383; 62 L Ed 2d 332 (1979).

"is limited by the superior power of the general Government to secure the uninterrupted navigability of all navigable streams within the limits of the United States. In other words, the jurisdiction of the general Government over interstate commerce and its natural highways vests in that Government the right to take all needed measures to preserve the navigability of the navigable water courses of the country even against any State action." [*McMorran Milling Co v C H Little Co,* 201 Mich 301, 308; 167 NW 990 (1918).][25]

In the instant case, plaintiffs claim that the deprivation of sand caused by defendant's construction of the boat ramp and jetties deprived them of their property without compensation. Undoubtedly, plaintiffs, as littoral owners, possessed a propriety interest in "the uninterrupted flow of

---

[25] The United States possesses a navigational servitude that, by virtue of the commerce power, is dominant over both the states and private landowners. Chief Justice Marshall, writing for the Court, explained:

Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse.

*      *      *

The power of Congress, then, comprehends navigation, within the limits of every State in the Union; so far as that navigation may be, in any manner, connected with "commerce with foreign nations, or among the several States, or with the Indian tribes." [*Gibbons v Ogden,* 22 US (9 Wheat) 1, 189-190, 197; 6 L Ed 23 (1824).]

In short, the navigable waters "are the public property of the nation, and subject to all the requisite legislation by Congress."

Not unlike Michigan law, "[t]he proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject." *United States v Rands,* 389 US 121, 123; 88 S Ct 265; 19 L Ed 2d 329 (1967). See also *United States v Cherokee Nation of Oklahoma,* 480 US 700; 107 S Ct 1487; 94 L Ed 2d 704 (1987).

sand carried to [their] land by the . . . 'current in [its]' natural state . . . ." *Miramar Co, supra* at 173. Yet, the interruption was caused by the State of Michigan while it was exercising its power to improve navigable waters[26] by constructing the boat launch.[27] Generally, an individual "has no such right as against the state. Littoral rights must give way to any use of the tide lands and water flowing over them that serves the public right of navigation." *Id.*

In *Miramar Co,* the State of California constructed a breakwater that prevented the replenishment of the plaintiff's beaches three miles down the ocean coast with sand. Not unlike the instant case, the plaintiff filed suit, claiming the subsequent loss of the beaches as a compensable taking. Justice Traynor explained the holding of the California Supreme Court:

> [T]he enjoyment of [the natural littoral drift including sand accretions] did not constitute a right to its perpetuation, for plaintiff's littoral rights were always subordinate to the state's right to improve navigation. The duration of the sandy accretions depended entirely upon the continuation of the littoral right, which from the beginning was subject to termination by the state. The withdrawal of the sandy accretions, constituting the damage to the plaintiff's land, was an incidental consequence of the state's use of the public domain for a public interest that was at all times superior to private littoral rights. There has therefore been

[26] The test of navigability "is whether the waters under consideration are capable of being used by the public as thoroughfares or highways for purposes of commerce, trade, and travel—of affording a common passage for transportation and travel by the usual and ordinary modes of navigation." *Giddings v Rogalewski,* 192 Mich 319, 324; 158 NW 951 (1916). There is no dispute regarding the navigability of the waters in the instant case.

[27] Plaintiffs do not dispute that the construction of the boat launch is a navigational improvement.

no taking or damaging of private property . . . .
[*Id.* at 176.]

Thus, "the generally recognized rule [is] that riparian or littoral owners are not entitled to compensation for erosion damage" created by navigable improvements by the state or federal governments. *Tamulion, supra* at 69.[28]

2

Yet, plaintiffs observe that they have lost much fast land. In fact, simply because the state is acting to improve navigation does not grant it the power to condemn all property without compensation. *Ryan, supra* at 211. Indeed, neither this Court nor the United States Supreme Court has ever "held that the navigational servitude creates a blanket exception to the Takings [sic] Clause . . . ." *Kaiser Aetna v United States,* 444 US 164, 172; 100 S Ct 383; 62 L Ed 2d 332 (1979). To the contrary, Michigan law has long held that "the limit of the public's right is the ordinary high water mark of the river. This means that the ownership of fast land is unqualified and not burdened with a public right." *Bartke, supra* at 432.[29] See also *Jarvis, supra* at 318-321 (holding that the public right of navigation was confined to the stream itself and that its boundary was the line of ordinary high water); *Hall, supra* at 167-168 (noting that land above the high-water line could not be taken without just compensation and due process); *Baumgartner v Sturgeon River Boom Co,* 120 Mich 321, 322; 79 NW 566 (1899). Federal law

[28] See also *Franklin v United States,* 101 F2d 459, 463 (CA 6, 1939), aff'd on other grounds 308 US 516; 60 S Ct 170; 84 L Ed 439 (1939); *Latourette v United States,* 150 F Supp 123, 126 (D Or, 1957).

[29] For a definition of "ordinary high water mark," see MCL 281.952(h); MSA 11.475(2)(h).

concurs. See, e.g., *United States v Willow River Power Co,* 324 US 499, 509; 65 S Ct 761; 89 L Ed 1101 (1945); *United States v Twin City Power Co,* 215 F2d 592, 599 (CA 4, 1954) ("the government does not own or have any servitude over the adjacent fast lands").[30] "Consequently, when fast lands are taken by the Government, just compensation must be paid." *United States v Rands,* 389 US 121, 123; 88 S Ct 265; 19 L Ed 2d 329 (1967).[31]

In fact, "an actual taking of fast land which is in part accomplished or accompanied by erosion and deprivation of access is no less demanding of compensation because of these methods or incidents of taking." *Tamulion, supra* at 69. This is so because "[t]here must also be horizontal limits to the 'bed' of [a waterway]; otherwise, the navigational servitude would extend infinitely in all directions and swallow up any claim for 'just compensation' . . . ." *Owen v United States,* 851 F2d 1404, 1410 (CA Fed, 1988).

For example, the permanent washing away of fast land and a house on the property caused by

---

[30] "The absolute ownership and right of private property in such land is not varied by the fact that it borders on a navigable stream." *Pumpelly* [n 16 *supra* at] 182. Consequently, even where improvement of navigation is the purpose, any taking outside the bed of the stream of adjacent "fast" lands must be compensated for as in any other taking of private property. *United States v Chandler-Dunbar Co,* 229 US 53, 60, 65; 33 S Ct 667; 57 L Ed 1063 [1913]. [*Twin City Power Co, supra* at 597-598.]

[31] See also *Hall, supra* at 167-168; *Kaiser Aetna, supra* at 177 ("none of these cases ever doubted that when the Government wished to acquire fast lands, it was required by the Eminent Domain Clause of the Fifth Amendment to condemn and pay fair value for that interest"); *United States v Virginia Electric & Power Co,* 365 US 624, 628; 81 S Ct 784; 5 L Ed 2d 838 (1961) ("Since the privilege or servitude only encompasses the exercise of this federal power with respect to the stream itself and the lands beneath and within its highwater mark, the Government must compensate for any taking of fast lands which results from the exercise of the power"); *United States v Dickinson,* 331 US 745, 751; 67 S Ct 1382; 91 L Ed 1789 (1947).

increased river velocity as the result of government construction is well within the scope of the
Taking Clause because there are no "valid distinctions between the undermining and permanent
loss of fast land (and a house) due to government-
caused erosion and the permanent flooding of fast
land due to government improvements to navigation found to be compensable by the Supreme
Court." *Id.* at 1415.

In the instant case, fast lands as well as the
shoreline were taken as a consequence of defendant's actions. The record reveals that a large
tree, grass, and other portions of plaintiffs' upland
property were swept away once the immediate
beachfront was lost. Such property was evidently
above the high-water mark of the property and
constituted fast lands. Defendant's failure to comply with condemnation proceedings and compensate for those losses, therefore, constituted an
unconstitutional taking of property without due
process and just compensation. *Id.; Tamulion, supra.*[32]

3

Furthermore, while the general rule is that only
the loss of fast lands must be compensated, plaintiffs suggest that because the loss of the beach
below the high-water mark was unnecessary to
construct the boat launch, the navigational servi-

[32] But see *Franklin,* n 28 *supra* (holding that the washing away of
fast lands caused by the construction of dikes was not compensable);
*Latourette,* n 28 *supra* (holding in nearly identical circumstances as
the instant case that the deprivation of accretions was uncompensable
even for lost fast lands). These cases, however, were decided without
the benefit of *Kaiser Aetna, Rands,* and *Virginia Electric & Power Co.*
This later precedent all but overrules the earlier lower federal court
cases, as *Owen, Twin City Power Co,* and *Tamulion* attest.

In any event, as a matter of Michigan law, this Court has always
held that the destruction of fast land is a compensable taking. See,
e.g., *Jarvis, supra* at 318-321.

tude does not insulate the state from a duty to pay compensation. Indeed, the trial court found that defendant's unscientific construction and design of the jetties proximately caused the destruction of plaintiffs' beach. As an unnecessary taking of property, defendant's actions violated the strict dictates of the constitutional guarantee that private property may be taken only when necessary for public purposes. *Humphrey, supra* at 474-475; *Paul, supra* at 119. As Justice COOLEY observed, "[t]he moment the appropriation goes beyond the necessity of the case, it ceases to be justified on the principles which underlie the right of eminent domain." 2 Cooley, Constitutional Limitations (8th ed), p 1147. Thus, "[w]hen a part only of a man's premises is needed by the public, the necessity for the appropriation of that part will not justify the taking of the whole, even though compensation be made therefor." *Id.* In other words, to legitimately exercise the power of eminent domain, the government must actually need to take the property.[33]

As the United States Supreme Court has more recently elaborated, property may only be taken when there exists an "essential nexus" between the taking and a legitimate state interest, and when there is "rough proportionality" between the manner of the taking and actual state interest involved. *Dolan v City of Tigard,* 512 US —, —; 114 S Ct 2309, 2319; 129 L Ed 2d 304 (1994).[34] While generally the navigational trust permits the

[33] As Justice GRIFFIN notes, this Court has also articulated this requirement as a "real and substantial relation" standard.

[34] Contrary to Justice GRIFFIN's suggestion, *Dolan* is not limited to its facts. In fact, *Dolan* simply rearticulates the necessity requirement always recognized in Michigan law. See, e.g., *Humphrey, supra* at 474-475; *Paul, supra* at 119. Nor does *Dolan* recognize the distinction between purely private property and riparian rights emphasized by Justice GRIFFIN. Regardless of the state's purported greater interest in nonfast lands, the state may not destroy or invade riparian rights unless necessary to fulfill its paramount trust in navigable waters.

state to improve waterways without compensating
for nonfast lands, the trust does not grant blanket
authority to destroy private property—the loss of
the property must be necessary or possess an
essential nexus to the navigational improvement
in question.[35] In the instant case, no essential
nexus existed between the construction of the boat
launch and the utter destruction of plaintiffs'
beach.[36] The taking of the property served no
public interest because the ramp could have been
built without destroying plaintiffs' property.[37]
Thus, we affirm the trial court's award of damages
for the loss of plaintiffs' property.

IV

A

Plaintiffs also allege that defendant's actions

[35] In other words, simply because the state's actions further its trust
in navigable waters, the state does not possess the power to destroy
private property interests with impunity. Any invasion of property
rights to further the navigable trust must be tempered with the
requirement that the actual means of the invasion was necessary or
possessed an essential nexus to further the trust. Hence, the building
of a dam that deprives a landowner of access to a navigable water
will often not constitute a compensable taking because the depriva-
tion of the access is the necessary consequence of building the dam
and possessed an essential nexus to the navigable trust. See, e.g.,
Rands, supra at 123. Thus, contrary to Justice GRIFFIN's suggestion,
the situation in Rands is not analogous to the instant case.

Nor does the building of the jetties in an unscientific manner
possess a real and substantial relation to the navigational servitude.
Justice GRIFFIN concludes that because the purpose of the jetties
furthers navigation that there existed a real and substantial relation
to the navigable servitude. Yet, the facts reveal otherwise. The
unscientific construction of the jetties had no relation to the navigable
servitude because the jetties could have been constructed to further
navigation and, at the same time, not destroy plaintiff's property.

[36] While Michigan has not utilized the essential nexus and rough
proportionality test in its jurisprudence, the well-established necessity
standard of Michigan jurisprudence and the federal standard dictate
the same result in the instant case.

[37] This is not a case in which the construction of a scientifically
sound launch was so costly as to make the project unfeasible.

constitute a compensable trespass-nuisance. Defendant counters that it is immune from liability for such injuries. Section 7 of the Governmental Tort Liability Act, MCL 691.1407(1); MSA 3.998(107)(1) provides:

> Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function.

Section 7, therefore, provides "broad immunity from tort liability to governmental agencies whenever they are engaged in the exercise or discharge of a governmental function . . . ." *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567, 595; 363 NW2d 641 (1984).[38] A governmental function is "an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law." *Id.* at 620. See also *Pawlak v. Redox Corp,* 182 Mich App 758; 453 NW2d 304 (1990).

In the instant case, there is no question that defendant was engaged in a governmental function by constructing the launch ramp and jetties. MCL 299.3; MSA 13.3 directs defendant to "provide and develop facilities for outdoor recreation . . . ." Similarly, the department is authorized to "acquire, construct, and maintain harbors, channels, and facilities for vessels in the navigable waters lying within the boundaries of the state of Michigan." MCL 281.504(a); MSA 3.534(4)(a).[39] Furthermore, the state has a strong interest in improving

[38] In the instant case, plaintiffs do not allege that a specific section of the act imposes liability on the government for the actions alleged in the instant case.

[39] While MCL 281.504(a); MSA 3.534(4)(a) is directed toward the State Waterways Commission, the commission was transferred to defendant. MCL 16.357; MSA 3.29(257).

its navigable waters. See, e.g., *Collins v Gerhardt,* 237 Mich 38; 211 NW 115 (1926).

B

Governmental immunity, however, is not absolute. Some state action that results in proprietary damages has been historically recognized as compensable despite general governmental immunity statutes to the contrary. Indeed, "[i]t is well settled that a municipality has no more right to invade or cause the invasion of private property than an individual." *Onen v Herkimer,* 172 Mich 593, 597; 138 NW 198 (1912). After all, " '[w]hat difference can it possibly make as to the commission of an illegal act, whether a man acts on behalf of thousands or on behalf of himself only?' " *Attorney General ex rel Wyoming Twp v Grand Rapids,* 175 Mich 503, 539; 141 NW 890 (1913), quoting *Spokes v Banbury Bd of Health,* 1 L Rep Eq 42 (1865).[40]

---

[40] Chief Justice COOLEY elaborated in a classic statement:

It is very manifest from this reference to authorities, that they recognize in municipal corporations no exemption from responsibility where the injury an individual has received is a direct injury accomplished by a corporate act which is in the nature of a trespass upon him. The right of an individual to the occupation and enjoyment of his premises is exclusive, and the public authorities have no more liberty to trespass upon it than has a private individual. If the corporation sends people with picks and spades to cut a street through it without first acquiring the right of way, it is liable for a tort; but it is no more liable under such circumstances than it is when it pours upon his land a flood of water by a public sewer so constructed that the flooding must be a necessary result. The one is no more unjustifiable, and no more an actionable wrong, than the other. Each is a trespass, and in each instance the city exceeds its lawful jurisdiction. A municipal charter never gives and never could give authority to appropriate the freehold of a citizen without compensation, whether it be done through an actual taking of it for streets or buildings, or by flooding it so as to interfere with the owner's possession. His property right is appropriated in the one case as much as in the other. [*Ashley v Port Huron,* 35 Mich 296, 301 (1877).]

The government, therefore, "cannot excuse its tortious taking of private property by invoking the shibboleth of governmental function." *Defnet v Detroit,* 327 Mich 254, 258; 41 NW2d 539 (1950).

Hence, "a direct trespass upon, or the interference with the use or enjoyment of, land that results from a physical intrusion caused by, or under the control of, a governmental entity" constitutes compensable injury. *Hadfield v Oakland Co Drain Comm'r,* 430 Mich 139, 145; 422 NW2d 205 (1988) (Brickley, J.).[41] Often referred to as the trespass-nuisance exception to governmental immunity, this Court more precisely defined the exception "as trespass or interference with the use or enjoyment of land caused by a physical intrusion that is set in motion by the government or its agents and resulting in personal or property damage. The elements may be summarized as: condition (nuisance or trespass); cause (physical intrusion); and causation or control (by government)." *Id.* at 169. See also *Li v Feldt (After Remand),* 434 Mich 584, 594; 456 NW2d 55 (1990).[42]

Perhaps the clearest trespass-nuisance is the permanent placement of an object on plaintiffs' property against the will of the plaintiff. See, e.g., *Rogers v Kent Bd of Co Rd Comm'rs,* 319 Mich 661, 667; 30 NW2d 358 (1948) (finding a steel post left in the ground after the expiration of a license to do so a trespass negating governmental immu-

[41] See also *Pennoyer v Saginaw,* 8 Mich 534 (1860); *Rogers v Kent Co Rd Comm,* 319 Mich 661, 671; 30 NW2d 358 (1948); *Herro,* n 16 *supra* at 270.

[42] While a governmental entity must have been a proximate cause of the injury, "the source of the intrusion" need not originate from "government-owned land." *Li, supra* at 594, n 10. Moreover, "[n]egligence is not a necessary element of this cause of action." *Robinson v Wyoming Twp,* 312 Mich 14, 24; 19 NW2d 469 (1945). This is true even if an instrumentality causing the trespass-nuisance was "built with all due care, and in strict conformity to the plan adopted by" a governmental agency or department. *Seaman v City of Marshall,* 116 Mich 327, 329-330; 74 NW 484 (1898).

nity); *Defnet, supra* at 258 (finding an active sewer under the plaintiffs' house a trespass negating governmental immunity). Yet, because of its invasion of a citizen's propriety interests, "it matters not that the continuity thereof was long or short in point of calendar time." *Herro v Chippewa Co Rd Comm'rs,* 368 Mich 263, 273; 118 NW2d 271 (1962). Hence, a trespass-nuisance has also been found to arise from flooding,[43] pollution,[44] or the production of sickening odors.[45] Similarly, invasions of property arising from the construction of buildings that cause the deviation of the normal flow of precipitation onto an individual's land may be the basis of liability. *Ferris v Detroit Bd of Ed,* 122 Mich 315, 318; 81 NW 98 (1899).[46] Furthermore, such nuisances may be halted by. the issuance of an injunction. See, e.g., *Wyoming Twp, supra* at 535.

While "[t]he Taking Clause of the constitution rests at the foundation of the trespass-nuisance exception," *Li, supra* at 594, n 10,[47] the two actions

---

[43] That the public authorities may not, without compensation, " 'turn water from its natural course onto the lands of another, is well settled.' " *Robinson,* n 42 *supra* at 24, quoting *Elliot v Carter,* 140 Mich 303, 305; 103 NW 600 (1905). See also *Merritt Twp v Harp,* 131 Mich 174, 177; 91 NW 156 (1902); *Herro, supra* at 272; *Hadfield, supra* at 184 (BRICKLEY, J.).

[44] *Wyoming Twp, supra* at 532 (holding that a municipality was liable for damages arising from sewage dumped into a river that then would overflow and decompose on or near a municipality).

[45] *Id.* at 539; *Trowbridge v Lansing,* 237 Mich 402, 404-406; 212 NW 73 (1927) (finding that the sickening and nauseating odors arising from a city owned garbage disposal plant constituted a compensable nuisance).

[46] The plaintiff had the right to the exclusive use and enjoyment of his property, and the defendant had no more right to erect a building in such a manner that the ice and snow would inevitably slide from the roof, and be precipitated upon the plaintiff's premises, than it would have to accumulate water upon its own premises, and then permit it to flow in a body upon his premises.

[47] See also *Hadfield, supra* at 166 (BRICKLEY, J.); *Gerzeski v Dep't of*

are distinct and the constitutional provision should not be confused with the assertion of the trespass-nuisance exception . . . ." *Hadfield, supra* at 165, n 10 (Brickley, J.). Hence, the damages awarded for a trespass-nuisance may not necessarily mirror or be incorporated within the damages awarded for taking property.[48]

In the instant case, defendant claims that it never physically invaded plaintiffs' property. The Court of Appeals agreed and held that because "sand was diverted *from* plaintiffs' land" that there was no trespass-nuisance. Plaintiffs contend that by filtering out sand from the water that reached their property, the property became invaded by purer water, which otherwise would not have existed. Yet, by its very definition, the extraction of sand from the water was not an invasion of plaintiffs' property. Unlike flooding, steel posts, sewers, or pollution, defendant had added nothing to plaintiffs' land. There has been no trespass. Thus, defendant's action cannot constitute a trespass-nuisance. Accordingly, we affirm the judgment of the Court of Appeals with regard to the trespass action.

V

In the instant case, we are presented with the scope of the constitutional guarantee that property shall not be taken by the state for public purposes without due process and just compensation. More specifically, we must determine whether the Department of Natural Resources must compensate property owners for the destruction of beachfront property caused by the filtration of sand from the

*State Hwys,* 403 Mich 149, 171; 268 NW2d 525 (1978) (Ryan, J., dissenting).

[48] Of course, plaintiff may not receive duplicative damages.

water because of the construction of a boat launch. We hold that while compensation is usually not necessary for the erosion of beach under the high-water mark caused by navigational improvements by the state, compensation is due for the destruction of plaintiffs' fast lands. Moreover, because defendant's unscientific construction of the boat launch unnecessarily caused the destruction of plaintiffs' beach, compensation must be awarded for the loss of the beach. Furthermore, we are presented with the scope of the trespass-nuisance exception to sovereign immunity. We hold that the filtration of sand *from* a bay that leads to the erosion of fast land does not fall within the exception. Hence, we reverse the judgment of the Court of Appeals in part and reinstate the damages awarded by the trial court.

LEVIN, BRICKLEY, and MALLETT, JJ., concurred with RILEY, J.

BOYLE, J. (*concurring*). I concur in the result, and in all parts of the majority's opinion except part III(A).

CAVANAGH, C.J., concurred with BOYLE, J.

GRIFFIN, J. (*concurring in part and dissenting in part*). While I concur in the holding by the majority that plaintiffs are entitled to compensation for the unconstitutional taking of their fast land property,[1] I respectfully dissent from part III(D)(3) of the opinion in which the majority states that plaintiffs are also entitled to compensation for erosion of the beach below the high-water mark, i.e., nonfast property. Because the Court of Claims awarded

---

[1] I also agree with the majority that the filtration of sand from a bay which causes the erosion of fast land does not fall within the trespass-nuisance exception to governmental immunity.

damages for the loss of all property, I would
remand to that court for an appropriate determi-
nation of damages resulting from the loss of plain-
tiffs' fast lands only.

I

As the majority observes, plaintiffs' property
interests at issue fall into two categories: (1) "fast
land" property, defined as property "that is 'above
the highwater mark of' the stream, river, or other
body of water that abuts the property,"[2] and (2)
"nonfast" or "subaqueous" property, which in-
cludes plaintiffs' beach, to the extent that it is
below the high-water mark of the bay.

While plaintiffs hold legal title to their fast land
property, legal title to all subaqueous land in
Grand Traverse Bay, including plaintiffs' nonfast
property, is held by the state in trust for the
people.[3] This trust imposes a duty on the state "to
secure to the people their rights of navigation,
fishing and fowling." *Collins v Gerhardt,* 237 Mich
38, 46; 211 NW 115 (1926). Thus, as the majority
correctly observes, "the state may enact certain
measures in furtherance of this trust—including
the fundamental power to improve the navigabil-
ity of such waterways on behalf of recreation and
commerce. See, e.g., *Nedtweg v Wallace (On Re-
hearing),* 237 Mich 14, 24-25; 211 NW 647 (1927)
(SHARPE, J., concurring)." *Ante* at 194.

The fact that title to nonfast property is held by

[2] *Ante* at 181, n 4, citing 26 Am Jur 2d, Eminent Domain, § 192,
p 873.

[3]   "[T]he title to submerged lands under the Great Lakes and
    the straits connecting them, but not the rivers, is in the State
    of Michigan in trust for the people. . . . [Bartke, *Navigability
    in Michigan in retrospect and prospect,* 16 Wayne L R 409, 421
    (1970).]" [*Ante* at 192.]

the state in trust does not mean the state has unfettered power to use such property; rather, a property owner holds riparian rights to navigable waters that abut the property. However, as the majority recognizes, riparian rights are held "subordinate to the public's right to navigate and the state's authority to improve navigation." *Ante* at 195. Therefore, "damage[s] to riparian properties arising from navigational improvements are often not compensable takings." *Id.*

In determining whether plaintiffs in this case are entitled to compensation for erosion of their nonfast land beach, the majority looks to federal authority and adopts, in part, a standard recently articulated by the United States Supreme Court in *Dolan v City of Tigard*, 512 US —; 114 S Ct 2309; 129 L Ed 2d 304 (1994).[4] Applying this standard, the majority concludes that plaintiffs are entitled to compensation because "no essential nexus existed between the construction of the boat launch and the utter destruction of plaintiffs' beach." *Ante* at 202. I respectfully disagree because it is clear that *Dolan* does not control the resolution of this issue in the case at bar.

A

In *Dolan*, the plaintiff landowner sought a permit from the city to redevelop her business site. The city granted her permit application subject to conditions, i.e., that plaintiff dedicate a portion of

---

[4] [W]e must first determine whether the "essential nexus" exists between the "legitimate state interest" and the permit condition exacted by the city. *Nollan* [*v California Coastal Comm*], 483 US [825] 837; 107 S Ct 3141; 97 L Ed 2d 677 [1987]. If we find that a nexus exists, we must then decide [whether] the exactions [imposed by the city are "roughly proportional" to] the projected impact of the proposed development. [*Dolan*, 129 L Ed 2d 317.]

her property "for improvement of a storm drainage system . . . and that she dedicate an additional 15-foot strip of land . . . as a pedestrian/bicycle pathway." *Dolan,* 129 L Ed 2d 313.

Plaintiffs' challenge to this decision was carried to the Oregon Supreme Court which ruled that the city could impose such conditions. However, on appeal, the United States Supreme Court framed the issue before it as a question left unresolved by its decision in *Nollan v California Coastal Comm,* 483 US 825; 107 S Ct 3141; 97 L Ed 2d 677 (1987): "[W]hat is the required degree of connection between the exactions imposed by the city and the projected impacts of the proposed development." *Dolan,* 129 L Ed 2d 311.

In *Dolan,* the Supreme Court opined that the conditions imposed by the city satisfied the mandate of *Nollan,* i.e., that an essential nexus existed between legitimate state interests and the permit conditions exacted by the city. *Dolan,* 129 L Ed 2d 318. However, the Court concluded that the conditions imposed constituted an uncompensated taking because the degree of exactions did not bear the necessary relationship—a "rough proportionality"—to the projected effect of the plaintiff's proposed development:

> We think a term such as "rough proportionality" best encapsulates what we hold to be the requirement of the Fifth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development. [129 L Ed 2d 320.]

Respectfully, I submit that *Dolan* does not control the instant case for several reasons. First, *Dolan* is a land use restriction case, and its analy-

sis is clearly confined to such a context. *Dolan* does not purport to alter the entire landscape of all taking jurisprudence; rather, it represents an extension of the scrutiny mandated by *Nollan* in determining the constitutionality of conditions attached by a governmental agency to the granting of a land use permit. That *Dolan* is inapposite as applied to this case is underscored by the fact that the majority ignores, and does not even apply, the "rough proportionality" prong on which *Dolan* turned.

Second, and even more important, the property at issue in *Dolan* was purely private property. In the case before us, title to the nonfast property is held by the state, albeit in trust for the people and subject to the subordinate interests of riparian owners. Compared to the purely private property at stake in *Dolan,* the state obviously has a much greater interest in the nonfast property at issue in this case.[5] Indeed, plaintiffs' interests here are more akin to the property interests in *United States v Rands,* 389 US 121; 88 S Ct 265; 19 L Ed 2d 329 (1967).

In *Rands,* the United States Supreme Court held in a unanimous opinion that a riparian owner's right of access to navigable waters is not property within the meaning of the Fifth Amendment:

> [The] power to regulate navigation confers upon the United States a "dominant servitude," which extends to the entire stream and the stream bed below ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights . . . for the damage sustained does

---

[5] Because of the significant interest held by the state in the property to which it has legal title, even if the "rough proportionality" test adopted by the majority were to be applied, I would find that the degree of harm is roughly proportional to the navigational improvement effectuated by the state.

not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject. Thus, without being constitutionally obligated to pay compensation, the United States may change the course of a navigable stream, or otherwise impair or destroy a riparian owner's access to navigable waters . . . . [389 US 123. Citations omitted.]

In my opinion, plaintiffs' right to compensation under the Fifth Amendment of the federal constitution for the erosion of nonfast property is controlled by *Rands,* not *Dolan.* Accordingly, I would hold that plaintiffs are not entitled to compensation under the federal constitution for the erosion of their nonfast beach.[6]

B

Even if relief is not available under the federal constitution, plaintiffs could still seek compensation under the Michigan Constitution, which also proscribes the taking of private property without just compensation.[7]

In determining whether the compensable taking of a riparian owner's right has occurred, this Court in *Hilt v Weber,* 252 Mich 198, 225; 233 NW 159 (1930), articulated the following standard:

Riparian rights are property, for the taking or

[6] See also 26 Am Jur 2d, Eminent Domain, § 192, p 873 ("[T]he washing away of the banks of a stream by a deflection of the current caused by the erection of piers or other structures in the stream . . . is held not to be a taking, but rather an incidental injury, since the owner might protect his lands from injury by piles or a sea wall," citing *Bedford v United States,* 192 US 217; 24 S Ct 238; 48 L Ed 414 [1904]).

[7] Const 1963, art 10, § 2 provides: "Private property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law."

destruction of which by the State compensation
must be made, *unless the use has a real and
substantial relation to a paramount trust purpose.*
[Emphasis added.]

The *Hilt* standard has been relied upon by this
Court[8] and by our Court of Appeals.[9] In addition,
*Hilt* is quoted with approval by the majority. *Ante*
at 192, n 19. I submit that the proper inquiry with
respect to the nonfast property interests at issue
in this case is whether erection of the jetties by
the state had a "real and substantial relation" to
the paramount trust purpose of improving naviga-
tion. I conclude that this question must be an-
swered in the affirmative.

The state constructed a boat-launch ramp to the
north of plaintiffs' property to provide public ac-
cess to East Grand Traverse Bay. As the majority
notes, the state then erected the jetties, which
were necessary "[t]o prevent the buildup of sand
on the launch, facilitate boat launching, reduce ice
damage to the ramp, and dissipate energy from
waves . . . ." *Ante* at 181. On these facts, the
erection of the jetties clearly had "a real and
substantial relation" to the improvement of navi-
gation.

This is not a case where the state

impair[ed] or defeat[ed] riparian rights by a grant
of land under water[,] . . . cut off the owner's
access to the water by construction of a highway[,]
. . . grant[ed] to strangers the right to erect
wharves in front of [plaintiffs'] property[,] . . . [or]
erect[ed] a bathhouse on the shore to interfere

[8] See *Soo Sand & Gravel Co v M Sullivan Dredging Co,* 259 Mich
489; 244 NW 138 (1932).

[9] See *Difronzo v Port Sanilac,* 166 Mich App 148; 419 NW2d 756
(1988); *Grosse Ile Twp v Dunbar & Sullivan Dredging Co,* 15 Mich
App 556; 167 NW2d 311 (1969).

with the right of access . . . . [*Hilt, supra* at 225-
226. Citations omitted.]

The majority's reliance on *Dolan* is inconsistent
with *Rands,* and effectively overrules *Hilt* and its
progeny. This exponential leap by the majority is
not justified on these facts nor is it supported by
any federal or state authority.

Accordingly, I dissent with respect to part III(D)(3)
of the majority opinion.