# STATE OF MICHIGAN

# COURT OF APPEALS

ANITA YU, JOHN BOYER, and MARY RAAB,

        Plaintiff-Appellants,

v

CITY OF ANN ARBOR,

        Defendant-Appellee.

UNPUBLISHED
May 9, 2017

No. 331501
Washtenaw Circuit Court
LC No. 14-000181-CC

---

LYNN LUMBARD, on Behalf of Herself and All
Others Similarly Situated,

        Plaintiffs-Appellants,

v

CITY OF ANN ARBOR,

        Defendant-Appellee.

No. 332675
Washtenaw Circuit Court
LC No. 15-001100-CC

---

Before: GADOLA, P.J., and JANSEN and SAAD, JJ.

PER CURIAM.

In these consolidated appeals, plaintiffs appeal as of right the trial court's orders granting summary disposition in favor of defendant, the City of Ann Arbor, and dismissing their cases with prejudice. For the reasons set forth in this opinion, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

In the late 1990s and early 2000s, Ann Arbor experienced unusually heavy rainfalls that caused backups in defendant's sanitary-sewer system. The backups forced defendant to discharge sewer water from its sanitary-sewer system into the Huron River and caused wastewater to overflow through floor drains in the basements of many homes within the city.

-1-

The cause of the problem was identified as footing drains[1] in some homes that collected storm water from around the home and emptied it into the city's sanitary-sewer system. Because the sanitary-sewer system was not intended to accommodate storm water, introducing storm water during heavy rainfalls overburdened the system and led to the overflow problems.

To address the issue, defendant passed an ordinance that notified homeowners with footing drains that connected into the sanitary-sewer system of the need to disconnect those drains from the sewer system. To facilitate these disconnects, the ordinance offered a program that allowed homeowners to use prequalified contractors to perform the disconnect work. The disconnect work consisted of installing sump pits, sump pumps, and related equipment to carry water from homeowners' footing drains to either the storm-water system or to a discharge location outside of the home. As part of the program, defendant agreed to pay up to $3,700 for the work performed, plus additional costs that were deemed necessary. Homeowners would then be responsible to purchase a backup sump pump, if desired, and to maintain the newly installed pump. To enforce compliance with the disconnect program, homeowners who refused or failed to disconnect a footing drain from the sanitary-sewer system within 90-days of receiving a certified letter of notice would be required to pay a $100 surcharge on subsequent sewage bills and could lose funding assistance for future disconnect work.

## A. DOCKET NO. 331501

Plaintiffs John Boyer and Mary Raab are married and own a home in Ann Arbor that had a footing drain connected to the sanitary-sewer system. They received a notice that their home was identified as one of the homes that needed to disconnect its footing drain from the sanitary-sewer system. The couple had a sump pump installed in their home in 2002. The original discharge location for the sump pump was outside of the home's kitchen. This placement allowed water to flow back toward the home, which then leaked into the basement. In 2003, the leak caused six inches of flooding in the basement. After the incident, defendant and its contractors assessed the problem and determined that a new discharge point was needed. Boyer asked that the discharge be directed to a storm drain on the curb of the street, but defendant and its contractors disregarded this request and moved the discharge point to an area in the backyard. As a result of the new placement, a permanent depression formed in the yard. Boyer and Raab testified that, since installing the sump pump, they have paid over $7,000 to maintain the system.

Plaintiff Anita Yu also owns a home in Ann Arbor and was notified by defendant that she needed to disconnect her footing drain from the sanitary-sewer system. Yu believed that participation in the disconnect program was mandatory. In May 2003, Yu had one of the city's

---

[1] Footing drains are small, perforated drainage pipes located near the foundation of a house. They are intended to keep rainwater that seeps through the ground from building up along the foundation or basement walls. In many homes, downspouts, which carry rainwater from the gutters, discharge near the foundation walls. This water drains through the soil and into the footing drains. In most homes constructed before the 1980s, the footing drains are connected to the house sanitary connection (house lead). This house lead then carries the footing drain flow and wastewater from the house into the sanitary-sewer system.

prequalified contractors come to her home for an evaluation. The contractor recommended installing the sump pump in the back of a crawl space under Yu's home. Yu objected to the location, but the contractor informed her that anywhere else would require payment beyond that approved by the city. Due to monetary constraints, Yu consented to the contractor's recommended location. In September 2003, the contractor installed the sump pump in the back of Yu's crawl space. Yu was then diagnosed with an incurable degenerative muscular condition, which she said made it impossible for her to maintain the pump without retaining a contractor.

Yu, Boyer, and Raab filed a complaint against defendant, alleging inverse condemnation claims under the state and federal Constitutions, as well as federal claims relating to involuntary labor. They argued that defendant physically and permanently occupied their properties by forcing them to install the sump pumps and other related equipment.

## B. DOCKET NO. 332675

Plaintiff Lynn Lumbard owns a home in Ann Arbor. In 2002, defendant notified Lumbard that her home was identified as one of the homes that needed to disconnect its footing drain from the sanitary-sewer system. Lumbard hired one of defendant's preapproved contractors to disconnect her footing drain and install a sump pump. In 2014, Lumbard's sump pump discharge line backed up, causing her basement to flood. It was later determined that the discharge pipe was buried too close to the ground surface and that cold weather caused the pipe to freeze. Lumbard was not reimbursed for the cost to repair any damage from the flood.

Lumbard filed a class action[2] complaint against defendant. In an amended complaint, Lumbard asserted that defendant's actions constituted a taking without just compensation under the Michigan Constitution.

## C. DEFENDANT'S MOTIONS FOR SUMMARY DISPOSITION

In Docket No. 331501, defendant filed a motion for summary disposition, arguing, in part, that Yu, Boyer, and Raab failed to state a claim upon which relief could be granted because defendant did not permanently and physically occupy plaintiffs' properties because plaintiffs maintained complete ownership of those properties.[3] At a hearing on the motion, Yu, Boyer, and Raab's counsel stated that they were pursuing a theory of "physical invasion," not regulatory taking. Counsel also agreed that plaintiffs "own[ed] the property" and that there was "no dispute about that," but argued that ownership was immaterial because defendant's physical invasion interfered with the ownership rights of exclusion and complete enjoyment. The trial court

---

[2] At no point during the lower court proceedings did the trial court certify Lumbard as part of a formal class, nor did the trial court ever formally recognize Lumbard's suit as a class action. See MCR 3.501(B).

[3] In October 2014, defendant stipulated to the dismissal of Yu, Boyer, and Raab's federal claims without prejudice, and the trial court entered an order to that effect.

ultimately denied defendant's motion under MCR 2.116(C)(8), but noted that defendant could file a motion under MCR 2.116(C)(10) once additional facts were developed in the case.

Defendant later filed a motion for summary disposition under MCR 2.116(C)(10), arguing that no taking by physical occupation occurred. Defendant noted that it was undisputed that Yu, Boyer, and Raab owned the sump pumps in their homes, and argued that a taking by physical occupation could not occur if the plaintiff owned the installation on his or her property. At a hearing on the motion, Yu, Boyer, and Raab maintained that a taking occurred because defendant interfered with their full rights of ownership. Yu, Boyer, and Raab conceded that they maintained title to the sump pumps and associated equipment, but argued that these items interfered with their rights to exclude others from their property. They argued that the determinative factor in any takings case, including a case involving a taking by permanent physical occupation, was the denial of a property owner's rights of ownership without compensation.

The trial court concluded that the "issue of ownership" was determinative and that installation of the sump pumps and associated equipment did not amount to a taking by permanent physical occupation because Yu, Boyer, and Raab retained ownership of the pumps and equipment. Accordingly, the trial court granted defendant's motion for summary disposition and dismissed the case because the "physical invasion" theory was the only theory on which Yu, Boyer, and Raab had sought relief.

In Docket No. 332675, defendant filed a motion for summary disposition, arguing that Lumbard's claims were barred by collateral estoppel by the trial court's order dismissing the case in Docket No. 331501. Defendant also argued that summary disposition of Lumbard's inverse condemnation claim was warranted under MCR 2.116(C)(8) because Lumbard failed to state in her complaint that defendant or one of defendant's agents deprived Lumbard of ownership of her property. Likewise, defendant argued under MCR 2.116(C)(10) that there was no issue of material fact regarding whether Lumbard owned the property that was the target of the alleged taking and, therefore, defendant was entitled to judgment as a matter of law. At a hearing on the motion, the trial court noted that the issue raised by Lumbard had already come before the court and it had rendered a decision. Therefore, the trial court granted defendant's motion "[f]or the same reasons" it had granted summary disposition in Docket No. 331501.[4]

## II. STANDARD OF REVIEW

We review de novo a trial court's grant or denial of a motion for summary disposition. *Arabo v Mich Gaming Control Bd*, 310 Mich App 370, 382; 872 NW2d 223 (2015). When reviewing a motion under MCR 2.116(C)(10), we consider all of the documentary evidence in a light most favorable to the party opposing the motion. *Id.* Summary disposition under MCR 2.116(C)(10) is proper if there is "no genuine issue regarding any material fact and the moving

---

[4] This Court later granted the parties' request to consolidate the cases on appeal. *Yu v City of Ann Arbor*, unpublished order of the Court of Appeals, entered June 29, 2016 (Docket Nos. 331501, 332675).

party is entitled to judgment as a matter of law." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). The parties do not contest the basic facts of the case; therefore, whether the trial court erred by granting summary disposition is dependent on whether defendant was "entitled to judgment as a matter of law." *Id.*

## III. ANALYSIS

Plaintiffs' sole argument on appeal is that the trial court erred as a matter of law by concluding that a taking by permanent physical occupation cannot occur if a plaintiff owns the installation. We disagree.

The Takings Clause of the Michigan Constitution states, "Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law." Const 1963, art 10, § 2. Generally, the Takings Clause of the Michigan Constitution offers the same level of protection as that of the United States Constitution.[5] See *Tolksdorf v Griffith*, 464 Mich 1, 2; 626 NW2d 163 (2001) ("The Taking Clause of the state constitution is substantially similar to that of the federal constitution."). In some instances, however, Michigan's Takings Clause "offers broader protection than" its federal counterpart. *AFT Mich v Michigan*, 497 Mich 197, 217; 866 NW2d 782 (2015).[6]

In *Cummins v Robinson Twp*, 283 Mich App 677, 707; 770 NW2d 421 (2009), this Court noted that there are two types of per se takings, also known as "categorical takings." " 'First, where government requires an owner to suffer a permanent physical invasion of her property— however minor—it must provide just compensation.' " *Id.*, quoting *Lingle v Chevron USA Inc*, 544 US 528, 538; 125 S Ct 2074; 161 L Ed 2d 876 (2005). " 'A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial us[e]" of her property.' " *Cummins*, 283 Mich App at 707, quoting *Lucas v South Carolina Coastal Council*, 505 US 1003, 1019; 112 S Ct 2886; 120 L Ed 2d 798 (1992) (emphasis in *Lucas*; alteration in *Cummins*). Apart from these two categories, the *Cummins* Court noted that a third type of takings, known as "regulatory takings," are " 'governed by the standards set forth in *Penn Central Transp Co v New York City*, 438 US 104[;] [98 S Ct 2646; 57 L Ed 2d 631] (1978).' " *Cummins*, 283 Mich App at 707, quoting *Lingle*, 544 US at 538 (second alteration in *Cummins*).

In this case, plaintiffs argue only that the first type of categorical taking occurred. Namely, plaintiffs argue that defendant permanently and physically occupied their property by forcing them to disconnect their footing drains from the sanitary-sewer system and install sump

---

[5] "[N]or shall private property be taken for public use, without just compensation." US Const, Am V.

[6] In *AFT Mich*, 497 Mich at 217 n 9, our Supreme Court only provided one example of when the state Takings Clause offers broader protection than the federal Takings Clause, that being in the context of the taking of private property and transferring that property to another private entity for "public use." Compare *Kelo v New London*, 545 US 469; 125 S Ct 2655; 162 L Ed 2d 439 (2005), with *Wayne Co v Hathcock*, 471 Mich 445; 684 NW2d 765 (2004).

pumps, sump pits, and other fixtures and equipment needed to facilitate the footing drain disconnect. The question on appeal is whether this conduct constituted a categorical taking as a matter of law. See *Latham*, 480 Mich at 111.

In *Loretto v Teleprompter Manhattan CATV Corp*, 458 US 419, 426; 102 S Ct 3164; 73 L Ed 2d 868 (1982), the United States Supreme Court recognized the first type of categorical taking by stating that "permanent physical occupation authorized by government is a taking . . . ." But the *Loretto* Court added that "[s]o long as the[] regulations do not require the landlord to suffer the physical occupation of a portion of his building *by a third party*, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity." *Id*. at 440, citing *Penn Central Transp Co*, 438 US 104 (emphasis added). The *Loretto* Court went on to explain that the "permanent physical occupation" analysis is dependent on whether the landowner owns the installation, stating the following in footnote 19 of its opinion:

> If § 828 required landlords to provide cable installation if a tenant so desires, the statute might present a different question from the question before us, since the landlord would own the installation. Ownership would give the landlord rights to the placement, manner, use, and possibly the disposition of the installation. The fact of ownership is, contrary to the dissent, not simply "incidental," it would give a landlord (rather than a CATV company) full authority over the installation except only as government specifically limited that authority. The *landlord* would decide how to comply with applicable government regulations concerning CATV and therefore could minimize the physical, esthetic, and other effects of the installation. Moreover, if the landlord wished to repair, demolish, or construct in the area of the building where the installation is located, he need not incur the burden of obtaining the CATV company's cooperation in moving the cable. [*Loretto*, 458 US at 440 n 19 (citation omitted).]

Although the *Loretto* Court was interpreting the federal Takings Clause, we find *Loretto* persuasive because our state Takings Clause is "substantially similar" to its federal counterpart. *Tolksdorf*, 464 Mich at 2.

Moreover, the principle from *Loretto*, 458 US at 440 n 19, is basic to any takings analysis under the Michigan Constitution. As this Court has stated, "The 'common touchstone' of all taking analyses is 'to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain.' " *Cummins*, 283 Mich App at 707-708, quoting *Lingle*, 544 US at 539. In other words, all takings analyses look to determine whether the government's action deprived a plaintiff of his or her ownership of property. See *Peterman v State Dep't of Natural Resources*, 446 Mich 177, 190; 521 NW2d 499 (1994) ("Any injury to the property of an individual which deprives the owner of the ordinary use of it is equivalent to a taking, and entitles him to compensation.") (quotation marks and citation omitted). *Loretto* merely applied this principle to the case of a taking by permanent physical occupation by the government; if an owner of real property owns the installation, it is not the functional equivalent of a classic taking in which an owner is ousted from his domain. See *Cummins*, 283 Mich App at 708. Accordingly, a permanent physical

occupation does not occur so long as the owner can exercise the rights of ownership over the installation. *Id.* at 707-708.

Turning to the facts of this case, we initially note that plaintiffs waived the issue of ownership. "Waiver is the voluntary and intentional relinquishment of a known right." *Varran v Granneman*, 312 Mich App 591, 623; 880 NW2d 242 (2015). "A party cannot stipulate with regard to a matter and then argue on appeal that the resulting action was erroneous." *Hodge v Parks*, 303 Mich App 552, 556; 844 NW2d 189 (2014). At the hearing on defendant's first motion for summary disposition in Docket No. 331501, plaintiffs' counsel stated that plaintiffs "own[ed] the property" and that there was "no dispute about that." Plaintiffs' counsel went on to state, "We're not challenging the fact that the property is still owned by the Plaintiffs[.]" Accordingly, the issue of ownership is waived. See *The Cadle Co v City of Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009) ("A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error.").

Even addressing the substance of the issue of ownership, however, plaintiffs clearly owned the installations. Ownership is defined as "[t]he bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others." *Black's Law Dictionary* (10th ed). Plaintiffs had use of the installations; the sump pumps pumped water from plaintiffs' footing drains to the storm-water system or to an aboveground outlet. Plaintiffs also managed the installations; part of their complaint was that they had to maintain the pumps, and they complain on appeal that they are responsible for the pumps' maintenance and operation.

Plaintiffs contest that they were not able to dispose of the pumps. However, plaintiffs did not present evidence to this effect before the trial court. See *Quinto v Cross & Peters Co*, 451 Mich 358, 363; 547 NW2d 314 (1996) ("If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, [a motion under MCR 2.116(C)(10)] is properly granted."). Moreover, evidence to the contrary was presented below; plaintiff Raab stated in her deposition that she had replaced her sump pump. The only limitation on this disposition is that plaintiffs would likely have to purchase any replacement equipment.

Plaintiffs also claim that they did not own the installations because they could not choose where the sump pumps were installed and could not move them once they were installed. See *Loretto*, 458 US at 440 n 19 ("Ownership would give the landlord *rights to the placement*, manner, use, and possibly the disposition of the installation.") (emphasis added). Again, plaintiffs provided no evidence that they could not move the sump pumps after they were installed. See *Quinto*, 451 Mich at 363. And nothing in the language of the ordinance prevented plaintiffs from moving the installations. Regarding the initial placement, plaintiffs rely on Yu's deposition, in which she stated that her sump pump was installed in her crawl space over her objection. However, it appears that all of the plaintiffs retained the final say regarding the placement of their sump pumps; the only caveat was that they would be responsible to pay any added costs if they chose a location that increased the installation price beyond what the city authorized.

Viewing the evidence in the light most favorable to plaintiffs, the trial court did not err by concluding that there was no taking by permanent physical occupation in this case because plaintiffs owned the installations on their properties.

Affirmed.

/s/ Michael F. Gadola
/s/ Kathleen Jansen
/s/ Henry William Saad