*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* RJM.

KRISTI FRENCH,

UNPUBLISHED
June 29, 2023

      Petitioner-Appellee,

v

No. 363599
Newaygo Probate Court

RJM,

LC No. 22-008915-MI

      Respondent-Appellant.

Before: GLEICHER, C.J., and RICK and MALDONADO, JJ.

PER CURIAM.

In this civil commitment proceeding, respondent appeals by right the probate court's finding that respondent was a person requiring treatment and ordering involuntary hospitalization. We affirm.

## I. BACKGROUND

These proceedings began following an incident in which respondent lit several of his belongings on fire in his home. Respondent was in an argument with his family about inheritance when he placed some of his personal belongings on the living room coffee table and lit them on fire. The fire was quickly extinguished with only minimal damage to the living room floor. Respondent testified that this action was "protected under the first amendment" because he was symbolically expressing his disinterest in material possessions. Respondent's mother became angry with him, and he then lit a towel on fire in the kitchen as "a cry for [his] family's support" and to show that he needed "support and love." When respondent was taken to the hospital he threatened the hospital staff, saying that he would "shoot people" and "blow up" the building.

Dr. Jeffrey Jackson, M.D., is an expert in psychiatry and diagnosed respondent with "unspecified bipolar disorder." Dr. Jackson explained the basis for this diagnosis:

-1-

[I]t appears that prior to coming into the hospital he had been what seems—seemed to be having what they would consider a manic episode. He was having decreased need for sleep. Seemed to be having racing thoughts. Getting into a lot of religious thinking. Some issues of paranoia. Feeling he'd been set-up by the police and sort of feeling that he possessed knowledge which was putting him in danger if it were revealed. Seemed to kind of culminate into some erratic behavior where he was setting fires inside of his home, which was put out by family. Believed he was brought to the emergency room, and at least at some point, was threatening staff there. Requiring some as needed [sic] medication. Has continued to have a fair amount of fixation in terms of, sort of, this secret knowledge that he possesses and concerned about, [sic] potentially, being in danger if that comes to light.

Since being hospitalized respondent had "been doing fairly well with sleep," and he had "not shown problems with activities of daily living." Dr. Jackson testified about other ways in which respondent improved since being hospitalized:

I think when he came into the hospital, he was quite religiously focused. He would often see, sort of, his actions in a very spiritual light in terms of renouncing possessions, that kind of thing. And, that piece faded away a bit and so, you know, at times he can present quite coherent and, you know, but once it kind of— conversation might veer into questions about sort of this knowledge that he's come across that often can get into fairly delusional kinds of statements. That continues to be a challenge I would say.

After the discussion of respondent's diagnosis, Dr. Jackson explained why he believed respondent posed a risk of harm to himself or others:

The treatment team's main concern has been the behavior which led him to be in the hospital. The, you know, poor choice of starting a fire in his own home. Since he is—somewhat downplays that though at times will acknowledge that perhaps it was not the best choice. My concern is leaving the hospital without medication, that he might make other, sort of, impulsive choices. I'm sort of pressed to, you know, in the context of some disagreements with family, which seem to be kind of an ongoing issue.

Dr. Jackson testified that respondent needed medication and more time in the hospital, and he believed that hospitalization was the least restrictive option that would meet respondent's needs.

The court determined that respondent was a person requiring treatment and ordered hospitalization. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Respondent argues that the trial court erred by finding that he was a person requiring treatment. We disagree.

Questions of statutory interpretation are reviewed de novo. *In re Tchakarova*, 328 Mich App 172, 182; 936 NW2d 863 (2019). The probate court's dispositional rulings are reviewed for

-2-

abuse of discretion. *Id.* An abuse of discretion occurs when the court's decision falls outside the range of principled outcomes. *Id.* Factual findings underlying the probate court's decision are reviewed for clear error. *Id.* A clear error occurs if this Court is left with a definite conviction that a mistake was made. *Id.*

Resolution of this issue requires interpretation and application of certain provisions of the Mental Health Code, MCL 330.1400 *et seq.*

When interpreting a statute, we follow the established rules of statutory construction, the foremost of which is to discern and give effect to the intent of the Legislature. To do so, we begin by examining the most reliable evidence of that intent, the language of the statute itself. If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted. Effect should be given to every phrase, clause, and word in the statute and, whenever possible, no word should be treated as surplusage or rendered nugatory. Only when an ambiguity exists in the language of the statute is it proper for a court to go beyond the statutory text to ascertain legislative intent." *Vermilya v Delta College Bd of Trustees*, 325 Mich App 416, 418-419; 925 NW2d 897 (2018) (quotation marks and citation omitted).

"Proceedings seeking an order of involuntary mental health treatment under the Mental Health Code for an individual on the basis of mental illness . . . generally are referred to as 'civil commitment' proceedings." *In re Portus*, 325 Mich App 374, 382; 926 NW2d 33 (2018). The process for ordering "treatment based on a person's mental illness are contained in various provisions of Chapter 4 of the Mental Health Code, MCL 330.1400 *et seq.*" *Id.* The term "person requiring treatment" is defined in section 401 of the mental health code, which provides in relevant part:

(1) As used in this chapter, "person requiring treatment" means (a), (b), or (c):

(a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

* * *

(c) An individual who has mental illness, whose judgment is so impaired by that mental illness, and whose lack of understanding of the need for treatment has caused him or her to demonstrate an unwillingness to voluntarily participate in or adhere to treatment that is necessary, on the basis of competent clinical opinion, to prevent a relapse or harmful deterioration of his or her condition, and presents a substantial risk of significant physical or mental harm to the individual or others. [MCL 330.1401.]

A person who suffers from a substance abuse disorder is not a person requiring treatment for the purposes of this statute. MCL 330.1401(2). "A judge or jury shall not find that an individual is a

-3-

person requiring treatment unless that fact has been established by clear and convincing evidence." MCL 330.1465.

## A. MENTAL ILLNESS

Respondent argues that the trial court clearly erred by finding that he had a mental illness. We disagree.

To establish that respondent was a person requiring treatment pursuant to either of the provisions cited above petitioner needed to establish that respondent suffered from a mental illness. MCL 330.1401. " 'Mental illness' means a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." MCL 300.1400(g). In this case, respondent was deemed a person requiring treatment pursuant to the court's finding that he suffered from unspecified bipolar disorder. The evidence that respondent suffered from unspecified bipolar disorder came entirely from the testimony of Dr. Jackson, who believed that respondent's erratic behavior was the result of a manic episode. This opinion was based on several symptoms: decreased need for sleep, paranoia, delusions of special knowledge that put him in danger, erratic behavior such as starting fires in his home, and threatening medical staff. Respondent is correct, however, that Dr. Jackson qualified this opinion, and the specific diagnosis given was somewhat speculative. Dr. Jackson testified that "it would be a bit unusual" for a person to have their first bipolar manic episode at 48 years old, and he also noted that respondent had used methamphetamine, which could have contributed to respondent's symptoms. Given these additional factors, Dr. Jackson conceded that it could not "easily" be said that respondent suffered from bipolar disorder or if he suffered from "something that might eventually get better."

MCL 330.1401 requires only that petitioner establish that respondent suffered from a mental illness; nothing in the statute's text suggests that petitioner must have pinpointed a specific diagnosis if petitioner did prove the existence of a mental illness. It is common knowledge that there are instances in which it is quickly apparent that a mental illness exists but more time is needed to ascertain an exact diagnosis. While Dr. Jackson wavered in his opinion that respondent suffers from unspecified bipolar disorder, he did not waiver in his opinion that respondent suffers from a mental illness. Dr. Jackson opined that it was not easy to say with certainty that respondent suffered from unspecified bipolar disorder as opposed to "something that might eventually get better." However, at no point did Dr. Jackson suggest that it was difficult to say with certainty that respondent has a mental illness.

Respondent makes much ado of the fact Dr. Jackson mentioned respondent's drug use. It is true that a substance abuse disorder cannot serve as the basis for finding that someone is a person requiring treatment, MCL 330.1401(2), and respondent argues that Dr. Jackson essentially conceded the possibility that his symptoms could have been attributed entirely to respondent's substance abuse. We believe respondent has mischaracterized Dr. Jackson's testimony. The trial court could reasonably have interpreted Dr. Jackson's testimony as an acknowledgment of the possibility that substance abuse might have exacerbated the symptoms of respondent's mental illness rather than a concession that substance abuse might have been the sole cause of respondent's symptoms.

-4-

The trial court could also have reasonably interpreted Dr. Jackson's testimony to mean that it could not be definitively ruled out that respondent's symptoms were the result of substance abuse. There does not appear to be any authority suggesting that proving that the relevant symptoms and behavior were caused by a mental illness requires definitively disproving all competing theories. However, in the context of criminal law, there is caselaw specifically stating that the prosecution does not need to disprove all theories consistent with innocence. See, e.g., *People v Chapo*, 283 Mich App 360, 363-364; 770 NW2d 68 (2009) ("The prosecution need not negate every theory consistent with innocence . . . ."). It follows, therefore, that a petitioner in a civil commitment proceeding need not negate every theory consistent with the absence of a mental illness.

Respondent's testimony lent further support for the court's finding that he suffers from a mental illness. In particular, respondent's testimony suggested that he was suffering from delusions. For example, respondent testified that he has "won cases in the Michigan Supreme Court" and that he had "cases docketed in the U.S. Supreme Court." Nothing in the record suggests that this was true, and even on appeal respondent's attorney does not suggest that respondent has in fact won cases in Michigan's Supreme Court or has docketed cases in the United States Supreme Court. Moreover, respondent testified about how his perceived threats to "blow up the hospital" were actually references to "blowing stuff up with his mind" and "shaking the foundations of the earth," and he then veered off into commentary about how the United States government's "inner workings" were "not cool and kosher" due to the ongoing events in Ukraine. Through this testimony respondent personally demonstrated his susceptibility to delusions.

For these reasons, the evidence supported the trial court's finding that respondent suffers from a mental illness.

## B. RISK OF FUTURE HARM

Respondent argues that, even if he did suffer from a mental illness, the trial court erred by finding that there was a risk that his illness would result in harm to himself or others. We disagree.

Subdivisions (1)(a) and (1)(c) both require some showing of anticipated future harm without court-ordered treatment in order to find that someone is a person requiring treatment. Pursuant to Subdivision (1)(a), the petitioner must show that the respondent, as a result of the mental illness, "can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation." MCL 330.1401(1)(a). Pursuant to Subdivision (1)(c), the petitioner must show that the respondent, due to a lack of understanding of the need for treatment and corresponding refusal to accept such treatment, "presents a substantial risk of significant physical or mental harm to the individual or others." MCL 330.1401(c). Respondent argues that neither of these standards were satisfied. While these are distinct standards, the same facts resolve respondent's arguments with respect to each of them.

Respondent's arguments largely hinge on the usage of the terms "seriously" and "significant," averring that any harm risked by his erratic behavior would be neither serious nor significant. This argument is defeated by the fact that respondent lit multiple fires inside his home, and at the hearing he still did not seem to recognize the action's inherent danger. The first fire was

lit in respondent's living room, purportedly to make a point about his disinterest in material possessions. Respondent emphasized the fact that the fire resulted in only minor damage to his floor, but it goes without saying respondent's decision to light a fire in his living room was incredibly dangerous and created a risk of lethal harm to both respondent and those around him. Despite this, respondent was unrepentant at the hearing. Respondent acknowledged that he did not obtain his desired outcome, but he defended his actions and insisted that lighting the fire was protected by the First Amendment. Respondent then lit a towel on fire in the kitchen as "a cry for [his] family's support," and he similarly did not say anything suggesting that he understood the danger caused by his actions. Rather, respondent defended himself by saying that he just wanted to show his mother he "just needed support and love rather than being bullied into submission." Because respondent engaged in extremely dangerous conduct then demonstrated an inability to appreciate the risks he created, it was not an error for the trial court to conclude both that there was a reasonable expectation of serious injury in the near future and that there was a substantial risk of significant harm. MCL 330.1401.

Further support for the court's finding comes from respondent's conduct following his emergency room hospitalization. Dr. Jackson testified that respondent "was threatening staff" after being taken to the hospital. Respondent denied having made any threats. When asked if he had threatened to shoot security, he testified that security assaulted him and that there was blood "all over" his bed as a result of having been assaulted in the hospital. Respondent acknowledged saying he would "blow up the hospital," but he insisted the statement was misunderstood and that he was actually talking about "blowing stuff up with [his] mind," "[s]hocking the conscience," and "shaking the foundation of the earth." The court, however, did not find any of respondent's testimony credible, and we defer to the trial court on matters of credibility. *Luna v Regnier*, 326 Mich App 173, 182-183; 930 NW2d 410 (2018).

Respondent also argues that there was no evidence pertaining to the magnitude of the harm that he might cause. Subdivision (a) requires that the potential harm be serious, and Subdivision (c) requires that the harm be significant. Respondent was hospitalized after lighting multiple fires inside his home and then he threatened to shoot hospital staff and blow up the hospital. As discussed above, respondent did not take responsibility for these actions or recognize that they were wrong, so the court had no reason to believe that such behavior would not reoccur. Furthermore, any of the conduct respondent partook in or threatened could cause both serious and significant harm. Therefore, this argument is likewise without merit.

For these reasons, the trial court did not clearly err by finding that the harm requirements of Subdivisions (a) and (c) were satisfied.[1]

---

[1] In the section of his brief discussing this issue, respondent summarily asserts that "[t]he evidence before the trial court simply does not meet the criteria of the statute and the due process afforded Respondent without a bending of those rules." This seems to be a restatement of respondent's sufficiency of the evidence argument reframed as a due process issue. However, for the reasons discussed above, respondent's sufficiency argument is without merit, so his corresponding due process argument is likewise without merit.

In conclusion, the trial court properly found that respondent was a person requiring treatment.

## III. HEARSAY

Respondent argues that the probate court's finding was based on inadmissible hearsay. We disagree.

Respondent did not raise this issue in the trial court, and thus, it is unpreserved. See *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). Unpreserved issues are reviewed for plain error affecting substantial rights, and a plain error occurs if three requirements are "met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (citation omitted).

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." MRE 801(a). "Hearsay is not admissible except as provided by" the Michigan Rules of Evidence. MRE 802. However, the rules of evidence do not apply in their entirety to all proceedings. MRE 1101(b) outlines the proceedings in which the rules of evidence do not apply, and pursuant to MRE 1101(b)(10), in civil commitment hearings "the court may consider hearsay data" if it is "part of the basis for the opinion presented by a testifying mental health expert."

We decline to address the merits of respondent's arguments pertaining to the admissibility and permissible uses of hearsay in civil commitment proceedings because the record does not support respondent's assertion that the trial court's decision was based on hearsay. Dr. Jackson testified about the subjective symptoms being experienced by respondent, but the record does not provide information pertaining to how this information was obtained. Even presuming *arguendo* that Dr. Jackson obtained information regarding respondent's symptoms via statements provided by respondent during Dr. Jackson's examination of him, this would be admissible pursuant to MRE 803(4), which allows admission of statements made for medical treatment and diagnosis. As it pertains to respondent's conduct, it is not clear from the record that the threats respondent made to hospital staff, to the extent it was described by Dr. Jackson, was based on hearsay rather than Dr. Jackson's personal observations. Moreover, much of the court's findings were based on the testimony of respondent, all of which was based on personal knowledge. Respondent admitted to lighting multiple fires in his home, and while he denied that it was a literal threat, respondent admitted saying that he would blow up the hospital. Finally, Dr. Jackson's conclusion that respondent suffered from a mental illness, most likely unspecified bipolar disorder, was based on his assessment of this properly-admitted evidence.

Therefore, respondent's argument that the probate court's decision was based on inadmissible hearsay is without merit.

## IV. FIRST AMENDMENT

Finally, respondent argues that the trial court wrongfully punished him for engaging in conduct protected by the free speech clause of the First Amendment to the United States Constitution. We disagree.

Questions of constitutional law are reviewed de novo. *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019).

Respondent's free speech argument relies largely on the United States Supreme Court's opinion in *Texas v Johnson*, 491 US 397; 190 S Ct 2533; 105 L Ed2d 342 (1989). In *Johnson*, the defendant was convicted of a crime and sentenced to a one-year prison term for violating a statute banning the desecration of a venerated object following an incident in which he publicly burned an American flag as a political protest. *Id*. at 399. Importantly, "[n]o one was physically injured or threatened with injury, though several witnesses testified that they had been seriously offended by the flag burning." *Id*. The Supreme Court concluded that the defendant's First Amendment rights were violated because he "was convicted for engaging in expressive conduct." *Id*. at 420.

Respondent's argument that "[t]here is no fundamental difference between Respondent's conduct and the conduct of burning the flag in *Texas v Johnson*" is without merit. *Johnson* involved a complete ban on desecrating the American flag, and such a ban is clearly aimed at stifling dissent. Had the defendant in *Johnson* lit an American flag on fire in his living room there likely would have been a different outcome because that would have been an issue of safety rather than expression. Similarly, if respondent had lit his personal belongings on fire in a controlled outdoor setting this case would likely have had a different outcome because it would have been an issue of expression rather than safety. Respondent's arguments concerning his free speech argument are largely based on the mistaken premise that "no one was harmed or in imminent risk" as a result of his conduct and that the court "thought that this behavior was odd and not something [it] thought to be appropriate." As discussed above, lighting fires in the middle of a home does create an imminent risk. Moreover, respondent raises strained arguments regarding whether there is a "specific prohibition that prevented Respondent from setting his personal property on fire." However, this argument is based on the mistaken premise that respondent was ordered to undergo mental health treatment because his conduct was prohibited. This is not the case; this erratic and dangerous conduct was evidence that he was a person requiring treatment, and his status as a person requiring treatment is what gave rise to judicial intervention.

Therefore, respondent's argument that he was deprived of his right to free speech is without merit.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado