*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Guardianship of AMMB.

---

ANDREW BAZAKIS, Guardian of AMMB, a
legally incapacitated person,

        Appellee,

v

CHRISTY BOMBA,

        Appellant.

FOR PUBLICATION
August 22, 2024
9:25 a.m.

No. 368915
Saginaw Probate Court
LC No. 20-140294-DD

---

Before: MALDONADO, P.J., and M. J. KELLY and RICK, JJ.

MALDONADO, P.J.

This case revolves around the care of AMMB, a legally incapacitated person. Appellant, Christy Bomba, is AMMB's mother, and appellee Andrew Bazakis, is AMMB's father. Bomba appeals by right the probate court's order removing her as AMMB's coguardian and appointing Bazakis as AMMB's sole plenary guardian. We affirm.

## I. BACKGROUND

AMMB suffers from a number of developmental and physical ailments, including autism spectrum disorder, obsessive compulsive disorder, and epilepsy. At the time of the hearings on this matter, AMMB was 21 years old, but she reads at a first-grade level and communicates at the level of a seven-year-old. AMMB is not capable of functioning without receiving full-time care, and she has always received the bulk of this care from her parents. When she was a minor, the two parents shared custody of her, and as an adult, they have been her coguardians. She also attends school at the Transitions Center in Saginaw, and she is enrolled at an adult daycare center. Following ongoing disagreements, accusation, and breakdowns in communication, both parties moved for appointment as sole plenary guardian. The trial court granted Bazakis's motion and denied Bomba's.

This appeal followed.

## II.  STANDARDS OF REVIEW

"This Court reviews for an abuse of discretion the probate court's dispositional rulings concerning guardianship. The court abuses its discretion when its decision falls outside the range of reasonable outcomes." *In re Bazakis Guardianship*, 342 Mich App 144, 146; 992 NW2d 673 (2022), vacated in part on other grounds ___ Mich ___; 1 NW3d 294 (2024).  The probate court also abuses its discretion when it errs as a matter of law. *In re Portus*, 325 Mich App 374, 381; 926 NW2d 33 (2018).

Decisions on evidentiary issues are likewise reviewed for abuse of discretion. *Shivers v Covenant Healthcare Sys*, 339 Mich App 369, 373; 983 NW2d 427 (2021).

This Court reviews the court's findings of fact for clear error. *In re Redd Guardianship*, 321 Mich App 398, 403; 909 NW2d 289 (2017).  "A factual finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

This Court reviews de novo questions of statutory and constitutional interpretation. *Redd*, 321 Mich app at 403.

Bomba raises certain arguments that are unpreserved. In civil cases, "Michigan generally follows the 'raise or waive' rule of appellate review." *Wells v State Farm Fire & Casualty Co*, 509 Mich 855; 969 NW2d 67 (2022) (quotation marks and citation omitted).  In general, "a failure to timely raise an issue waives review of that issue on appeal." *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008) (quotation marks and citation omitted).  However, "this Court retains the authority to decide an unpreserved issue if it concerns a question of law and all the facts necessary for its resolution have been presented." *Whitmer v Bd of State Canvassers*, 337 Mich App 396, 412; 976 NW2d 75 (2021).

There used to be inconsistency among this Court's opinions regarding the extent to which the plain error rule, as articulated in *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), is applicable in civil cases.  The matter was largely settled when this Court clarified that "the plain-error rule of *Carines* does not apply to civil cases . . . ." See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 359090); slip op at 5.  However, the Court excepted termination of parental rights cases from this holding, reasoning that such cases "present different constitutional considerations." *Id*. at ___ n 3; slip op at 5.  However, another exception was carved out when this Court decided that the plain error rule was "more appropriate" for child custody cases than the 'raise or waive' rule. See *Quint v Quint*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368002); slip op at 1.  In *Quint*, this Court opened the door to additional exceptions, explaining that "there are certain discrete civil matters" in which plain error applies. *Id*. at ___; slip op at 7.  The Court reasoned that child custody fell within this category because the best interests of children "are directly and often irrevocably affected, but" their voices are "not always fully heard, even when there is a lawyer-guardian ad-litem involved." *Id*.

We believe plain-error review is appropriate for guardianship cases such as this. Similar to cases involving child custody and termination of parental rights, the parties are not litigating their own rights; rather, the parties are litigating the rights of a vulnerable third party "whose voice is not always fully heard . . . ." *Id*. It would be unjust to AMMB for an argument supporting her interests to be overlooked due to a lack of diligence on the part of her parents. Therefore, we review any unpreserved arguments in this matter for plain error affecting substantial rights.

> To show that a plain error occurred warranting reversal, the following four elements must be established on appeal: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) the plain error affected substantial rights, and 4) once [an appellant] satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted when the plain, forfeited error seriously affected the fairness, integrity or public reputation of judicial proceedings. [*Id*. (quotation marks and citation omitted).]

### III. AMMB'S ROLE IN THE PROCEEDINGS

Bomba argues that the trial court erred by excusing AMMB's presence during the proceedings and by ascertaining her preference in an unrecorded *in camera* interview. Each of these arguments lacks merit.

### A. PRESENCE IN COURTROOM

Bomba has failed to establish that the probate court erred by allowing AMMB to be excused from the courtroom during these proceedings.

AMMB was present in the courtroom for the first day of the proceedings, but her guardian ad litem (GAL) subsequently moved to excuse her from the hearings. The GAL provided letters from AMMB's primary care physician as well as her psychiatrist in which they each opined that it would be detrimental to AMMB's wellbeing to attend the court proceedings. Bomba opposed the motion and argued that the letters were based entirely on statements Bazakis had provided. The court ultimately granted the motion and excused AMMB from attending the proceedings.

Bomba argues that the court failed to abide by the requirements of MCL 330.1455(1), which provides:

> The subject of a petition has the right to be present at all hearings. . . . The subject's presence may be waived by the court if there is testimony by a physician or licensed psychologist who has recently observed the subject that the subject's attendance would expose him or her to serious risk of physical harm.

Bomba argues that this statute was not satisfied because the doctors did not testify, the doctors had not *recently* observed AMMB, and there was no evidence that AMMB's attendance would expose her to risk of physical harm. Notably, this particular argument is unpreserved as it was never raised in the trial court. See *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). Regardless, Bomba cannot establish any error, particularly plain error, because MCL 330.1455 does not apply to this proceeding.

MCL 330.1455 is from Chapter 4 of the Mental Health Code, MCL 330.1001 *et seq*., which pertains to civil commitment proceedings. "The subject of a petition" for the purposes of that statute, "means an individual regarding whom a petition has been filed with the court asserting that the individual is or is not a person requiring treatment or for whom an objection to involuntary mental health treatment has been made under section 484." MCL 330.1400(k). Relevant to this case is Chapter 6 of the Mental Health Code, which governs guardianships for the developmentally disabled. MCL 330.1600 to 330.1644. The trial court properly considered the matter pursuant to MCL 330.1617(4), which provides:

> The respondent shall be present at all proceedings conducted pursuant to this chapter. However, the respondent's presence may be excused by the court only on a showing, supported by an affidavit[1] signed by a physician or psychologist who has recently examined the respondent, that the respondent's attendance would subject him or her to serious risk of physical or emotional harm.

Even if Bomba's arguments regarding the recency of AMMB's evaluations were viewed in relation MCL 330.1617, Bomba has presented no authority or rationale to support her naked assertion that six months is not recent.

Therefore, we discern no error with respect to the probate court's decision to excuse AMMB from the proceedings.

## B. AMMB'S PREFERENCE

Bomba argues that the probate court erred by ascertaining AMMB's preference by conducting an unrecorded *in camera* interview without any parties or attorneys present rather than having her testify. We disagree.

On the first day of the hearings, Bomba sought to call AMMB to testify about where she would like to live. AMMB's GAL objected on the basis that she was not competent to testify as a witness. Counsel for Bomba argued that AMMB had the right to "articulate her needs and preferences of who she wants as co-guardian," and the trial court responded, "I usually talk to them." The court ruled that

> [t]o the extent that Mrs. Bomba asks that [AMMB] advise the Court of her living preferences on the record by testimony, her request is denied under MCL 330.1628. Subsection provides that the court shall make a reasonable effort to question the individual concerning his or her preference regarding the person to be appointed guardian and any preference indicated shall be given due consideration. That provision does not require that the questioning take place on the record. I believe that [AMMB] would be more comfortable talking to me off the record in a more private setting such as my chambers . . . .

---

[1] Bomba has not questioned in the trial court or on appeal whether the letters presented to the court in this case met the procedural requirements for being affidavits.

-4-

Bomba argues that AMMB should have been required to testify, or at minimum, the *in camera* interview should have been transcribed.

Resolution of this issue requires application of MCL 330.1628(2), which provides: "Before the appointment [of a guardian], the court shall make a reasonable effort to question the individual concerning his or her preference regarding the person to be appointed guardian, and any preference indicated shall be given due consideration." The purpose of statutory interpretation is to determine the Legislature's intent. *Rouch World, LLC v Dep't of Civil Rights*, 510 Mich 398, 410; 987 NW2d 501 (2022). The statutory language is the most reliable indicator of the Legislature's intent. *Id*. This Court enforces clear, unambiguous statutory language as written. *Id*. The simplest resolution of this issue is the fact that the statute simply does not require that the ward testify or that the ward's preferences be recorded in the record. Bomba is not asking us to interpret a statute, but add to it; this is not something we can do. Moreover, the instruction that the court "make a reasonable effort to" perform this task suggests a delegation of broad discretion to craft a method for ascertaining a ward's preference. Furthermore, a closer examination of the statute makes clear that the term "to question" does not imply a need for sworn testimony.

The term "to question" is not defined by the Mental Health Code. This Court may consult a dictionary to determine the meaning of undefined statutory terms. *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). The verb "to question" means "to ask a question of or about." *Merriam-Webster's Collegiate Dictionary* (11th ed).[2] The most pertinent meanings of the noun "question" are (1) "an act or instance of asking : inquiry" and (2) "a judicial or official investigation." *Merriam-Webster's Collegiate Dictionary* (11th ed). The verb "to ask" means "to call for an answer." *Merriam-Webster's Collegiate Dictionary* (11th ed). In summary, to question the individual in this context means to call upon the person for an answer about their preference for a guardian.

Additional support for our conclusion is found when the statute is read in relation to the rest of the Mental Health Code. When construing a statute, this Court should read phrases "in the context of the entire legislative scheme." *Mich Props, LLC v Meridian Twp*, 491 Mich 518, 528; 817 NW2d 548 (2012). See *Redd*, 321 Mich App at 405. The use of different words generally indicates that the words have different meanings. *US Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 14; 795 NW2d 101 (2009). Unlike the verb "to question," the verb "to testify" has a unique legal meaning. See *Black's Law Dictionary* (11th ed). The meanings of "to testify" are "[t]o give evidence as a witness" and "to bear witness." *Black's Law Dictionary* (11th ed). Other provisions of the Mental Health Code specify circumstances in which an individual must testify. See, e.g., MCL 330.1461(2) (physician or licensed psychologist required to testify that a person requires hospitalization); MCL 330.1517(3) (physician or licensed psychologist required to testify that intellectually disabled person requires treatment). The Legislature's use of language with a unique legal meaning in some provisions of the Mental Health Code but language without a unique legal meaning in MCL 330.1628(2) supports that an inference the Legislature intended the verb "to question" to have a different meaning.

---

[2] Although additional definitions are available, these definitions are the most contextually appropriate considering the context of the statute.

Finally, this distinction makes logical sense. "[C]ourts should not abandon common sense when construing a statute." *Hmeidan v State Farm Mut Auto Ins Co*, 326 Mich App 467, 478; 928 NW2d 258 (2018) (quotation marks and citation omitted; alteration in original). It is possible for a person to lack the mental capacity to testify. See MRE 601(a). There may be cases in which a developmentally disabled person simply does not have the capacity to testify, and in those cases, a court would not be able to satisfy a testimony requirement regarding that person's preference for a guardian. Additionally, the purpose of this statutory scheme is to protect individuals who are particularly vulnerable to exploitation. Accordingly, it makes sense that a court would have the discretion to question an individual in a manner that prevents outside influence, including pressure from prospective guardians.

Bomba's argument that *in camera* interviews are impermissible relies largely on *In re HRC*, 286 Mich App 444; 781 NW2d 105 (2009), a case involving the termination of parental rights. In that case, this Court stated that "the use of an unrecorded and off the record in camera interview *in the context of a juvenile proceeding*, for whatever purpose, constitutes a violation of *parents'* fundamental due process rights." *Id*. at 456 (quotation marks and citation omitted; emphasis added). The different context and liberty interests makes this case plainly distinguishable. It is well established that parents have a significant liberty interest in the care and custody of their children. *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003). However, parents do not have a liberty interest in exercising control of the affairs of their adult children. This case involves the rights and interests of AMMB, not her parents. Bomba also briefly touches on MCL 330.1618 (concerning the necessary findings of fact in a guardianship hearing), MCR 5.405 (concerning hearings that are not held in a courtroom), and MCR 7.210 (concerning the record on appeal), which she argues support her argument regarding the applicability of *HRC*. None of these authorities concern *in camera* interviews.

Bomba's alternative, and unpreserved, contention that the *in camera* interview should have been recorded is completely baseless. Bomba cites a provision from the rules of appellate procedure requiring that the "portion of the transcript concerning the order appealed need be filed." MCR 7.210(B)(1)(b). It does not follow from a rule that relevant transcripts be filed that every step relevant to a proceeding must be transcribed. Indeed, this Court routinely reviews child custody matters in which *in camera* interviews of minor children are not transcribed. Simply put, there is no authority that supports this argument.

In sum, the trial court did not err by conducting an unrecorded *in camera* interview of AMMB to ascertain her preference.

## IV. PROBATE COURT'S ORDER

Bomba raises a multitude of challenges to the probate court's order, none of which merit appellate relief.

## A. TIMING OF DECISION

Bomba argues that the trial court violated her right to due process by entering its order before she testified on the third day of the hearing. We disagree.

-6-

The Michigan and United States Constitutions provide in part that no person shall be deprived of property without due process of law. US Const, Am XIV; Const 1963, art 1, § 17. "[D]ue process requires that litigants have their cases heard in full before an impartial decision maker." *Kar v Hogan*, 399 Mich 529, 545; 251 NW2d 77 (1976). In this case, the probate court's order has a stamp on it indicating that it was filed on November 22, 2023, at 9:30 a.m.[3] However, the proceeding at which the court rendered its decision did not *begin* until 1:33 p.m. Bomba argues that this proves that the court made its decision before hearing Bomba's testimony, thus depriving her of the right to a fair hearing before an impartial tribunal.

The record does not support Bomba's argument. A highly plausible explanation for this discrepancy is that the clerk updated the stamp in the morning to reflect the new date and forgot to update the time when the order was filed that afternoon. There is nothing in the record suggesting that the time on the stamp is always consistent with the actual time the stamp was used, and the angle of the stamp suggests that it was done manually rather than through some automated process. There is no evidence in the record regarding the process of stamping these orders, and Bomba has not moved for a remand to take testimony on the matter. Notably, after rendering its opinion, the trial court stated that "[t]he Court *will* sign orders and letters to that effect." Moreover, the order removing Bomba as AMMB's coguardian was entered in the lower court register of actions on November 22, 2023, at 3:36 p.m. Bomba has not established that this stamp should trump the register of actions as well as the court's own word.

## B. ADEQUACY OF FACTUAL FINDINGS

Bomba argues that the probate court failed to make factual findings compliant with the requirements of the relevant statutes. We disagree.

In this case, the probate court made extensive factual findings on the record. It provided an overview of the case's procedural history and explained that its decision was based on all of the record evidence as well as its conversation with AMMB regarding her preferences. It stated that it was able to "judge the veracity and credibility of the parties," which it described as "invaluable" because credibility "is one of the most important factors" for cases such as this. It noted some of the points of contention during this case, such as Bomba's alleged frustration of medical appointments and issues with a trust established by Bazakis. The court described "[t]he hatred

---

[3] The stamp itself appeared as follows:



For the purposes of this opinion, we will accept as true Bomba's assertion that "A 9:30" means 9:30 a.m.

among the parties" as "very obvious" and observed that it was "not in the best interest of" AMMB. The court, "looking at the best interest of AMMB," decided to grant Bazakis's petition and make him the sole guardian.

Bomba argues that the trial court erred by failing to set forth its factual findings in a written order. Bomba supports this argument with a citation to MCL 330.1637(4), which provides:

Upon conclusion of the hearing [regarding a petition to remove a guardian], the court shall enter a written order setting forth the factual basis for its findings and may do any of the following:

(a) Dismiss the petition.

(b) Remove the guardian and dissolve the guardianship order.

(c) Remove the guardian and appoint a successor.

(d) Modify the original guardianship order.

(e) Make any other order that the court considers appropriate and in the interests of the individual with a developmental disability.

The only written findings that the court made were on a boilerplate form provided by the SCAO. Using this form, the court found:[4]

1. Notice of hearing was given to or waived by all interested persons.

2. A petition to modify the guardianship was filed with this court and should be granted.[5]

3. The coguardian should be removed.

4. The individual continues to require a guardian based on the same criteria found by the court on the original petition.

Because the statute requires that the court's order set forth the "*factual basis* for its findings," rather than just setting forth its findings, it certainly is questionable whether this boilerplate order, standing alone, is sufficient. However, we do not need to answer this question because, even assuming arguendo that the court erred, the error does not warrant reversal.

---

[4] This restatement of the court's findings was based on the boxes checked on the form and a pair of handwritten alterations.

[5] The court left both the "granted" and "denied" boxes unchecked, but it is clear from the statements on the record and the rest of the order that this was unintentional.

This issue is unpreserved because Bomba failed to object and request written findings when the court indicated its intent to "sign orders and letters" and Bazakis's attorney volunteered to prepare the order. Plain error review requires a showing that the error affected the outcome of the proceeding, *Carines*, 460 Mich at 763, and there is simply no basis upon which to conclude that the outcome would have been different if the court had written its findings instead of only orally announcing them. Even if this issue were properly preserved, it would nevertheless fail to survive harmless error review. "[U]pon a finding of error an appellate court should remand the case for reevaluation, unless the error was harmless." *Fletcher v Fletcher*, 447 Mich 871, 889; 526 NW2d 889 (1994). An error is harmless "if it was not decisive to the outcome of the case." *In re Williams*, 333 Mich App 172, 181; 958 NW2d 629 (2020). No reasonable person could argue in good faith that neglecting to write out the court's findings was decisive.

Bomba argues that the probate court erred by failing to comply with the requirements of MCL 330.1618, which provides in relevant part:

> (1) The court, at a hearing convened under this chapter for the appointment of a guardian, shall do all of the following:

> (a) Inquire into the nature and extent of the general intellectual functioning of the respondent asserted to need a guardian.

> (b) Determine the extent of the impairment in the respondent's adaptive behavior.

> (c) Determine the respondent's capacity to care for himself or herself by making and communicating responsible decisions concerning his or her person.

> (d) Determine the capacity of the respondent to manage his or her estate and financial affairs.

> (e) Determine the appropriateness of the proposed living arrangements of the respondent and determine whether or not it is the least restrictive setting suited to the respondent's condition.

> (f) If the respondent is residing in a facility, the court shall specifically determine the appropriateness of the living arrangement and determine whether or not it is the least restrictive suited to the respondent's condition.

> (2) The court shall make findings of fact on the record regarding the matters specified in subsection (1).

This statute is plainly inapplicable because this case did not involve a "hearing convened . . . for the appointment of a guardian . . . ." MCL 330.1618(1). Rather, this was a hearing convened for the removal of a guardian for a person whom the court had already determined a guardian was needed.

Finally, Bomba argues that the trial court erred by failing to explicitly delineate its credibility findings. It is true that the probate court never explicitly stated that it found Bazakis more credible, but the court clearly implied as much by emphasizing how important credibility is

to these decisions and then proceeding to grant Bazakis's petition. Regardless, Bomba has cited no authority supporting her assertion that a court must explicitly state its credibility findings. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority." *In re Warshefski*, 331 Mich App 83, 87; 951 NW2d 90 (2020) (quotation marks and citation omitted).

## C. STANDARDS USED

Bomba raises several arguments pertaining to the standards and considerations used by the probate court when rendering its decision, each of which is without merit.

### 1. FACTORS CONSIDERED

Bomba argues that the probate court failed to consider the necessary factors when it made its findings. Bomba cites MCL 330.1631(1), which lists the duties of a guardian; it is not a list of factors for the court to consider when removing a guardian. Therefore, it does not support Bomba's position. Bomba also cites *In re Guardianship of Redd*, 321 Mich App 398, 407-408; 909 NW2d 289 (2017), which suggests "that particularly relevant evidence would include (1) evidence on whether the guardian was still qualified and able, and (2) evidence on whether the guardian did, in fact, satisfactorily provide for the ward's care, custody, and control in the past" when deciding if a guardian is "suitable" for the purposes of the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq*. *Redd* is not applicable because this case involves the Mental Health Code, not EPIC. Regardless, identifying "particularly relevant evidence" is a far cry from articulating mandatory factors.

### 2. BEST INTERESTS FACTORS

When explaining the bases for its decision, the court stated that it "even looked at the best interest factors of child custody" to assist with its deliberations. "Generally, this Court considers a court's statements in context and in the context of the issues raised by the parties." *Graziano v Brater*, 342 Mich App 358, 367; 994 NW2d 521 (2022). When this comment is viewed in context, it is clear that this was just one of the many sources the court considered when making its decision. There is no suggestion that this was the only, or even a major, consideration, and there is no authority barring courts from considering how the best interest factors would apply in the context of a guardianship. In this case, it makes particular sense for those factors to be one of the court's reference points given that the parties are AMMB's parents.

### 3. DECISIONS BY BOMBA'S COUNSEL

Bomba argues that the probate court erred by considering legal decisions made by her attorney when deciding whether to remove her as coguardian. We disagree.

Bomba takes exception to the following statement made by the court: "In June that started with a new attorney with limited appearances and we had a lot of problem [sic] with that." The court was simply going through the case's procedural history, and there is no indication that this was considered at all, let alone against Bomba. Bomba also objects the following statement:

-10-

Then there was a Trust issue that came on with a hearing on August 8 of 2023 where I ruled that there was no standing where the parties appeared at the hearing and knew that they wouldn't have any hearing but I did not sanction them even though I felt it was frivolous at the time.

Bomba takes this out of context. The court noted that it had "dealt with many of these issues in the past" and the comment about the trust was an example supporting that statement. Again, there is no indication that this was held against Bomba when assessing her suitability to be AMMB's guardian.

Finally, Bomba argues that the court's "findings took issue with the timing of the cross-petition and that leave to amend the request in the cross-petition was required by the probate court and not sought," highlighting the court's remark that "there was a cross petition filed very recently in the matter without permission to amend . . . ." This statement has been stripped of context. In full, the court said:

In addition, there was a cross petition to modify the guardianship filed very recently in the matter without permission to amend, but I have considered that petition knowing what they want, that they wanted co's distributed, [sic] but also indicating that a public guardian should be considered, and the Court does always consider that in problems like this.

The court simply stated a fact when it noted that Bomba did not request permission to amend, and the following statement that it considered the petition anyway contradicts Bomba's position. In sum, there is once again no indication that this was held against Bomba at all.

### 4. ERRONEOUS STATEMENTS

Finally, Bomba argues that the probate court made "patently erroneous statements" when making its findings. We disagree.

The court stated that "[t]he hatred among the parties has been very obvious and not in the best interest of" AMMB, and it indicated agreement with the GAL's comments to that effect. Bomba then isolated statements made by the GAL suggesting that both parties were competent and that she could not make a recommendation for either of them. The GAL also said "that these parties acting together are just not working on behalf of" AMMB and that "working together there's so many other issues that they tend to forget that [AMMB is] the center of this." Bomba then makes numerous arguments regarding Bomba's ability to meet AMMB's medical needs based on a mistaken belief that the probate court fully incorporated the GAL's closing statements into its findings. Rather, the probate court simply agreed with the GAL's assessment of the parties' inability to collaborate. Bomba also attacked the probate court because it allegedly considered factors that are not delineated "under the Code as to whether a person is no longer a suitable guardian." The Mental Health Code does not list factors to consider and does not bar consideration of any of the factors considered by the probate court.

Bomba argues that the following statement by the probate court was inconsistent with Bomba's testimony: "Both parties have asked me to eliminate the two-week co-guardianship schedule. Mom said it would be in her best interest, basically saying that she won't have to see

-11-

her dad, but hadn't suggested any other means of co-parenting." During cross-examination, Bomba was asked whether she would allow AMMB to spend nights with Bazakis if she were the sole guardian:

> I would say yes to over nights if [AMMB] wanted them to happen. If she says to me I want to spend the night at my dad's, I would say—his number is in her phone and [Bazakis] knows that she calls whenever she wants to call him, she can call him and ask. So if she wants an over night, [sic] I'm not going to tell her no.

This is consistent with the court's recitation of her testimony. The court said that AMMB "won't *have to* see" Bazakis, and Bomba testified that AMMB would only spend nights with Bazakis if AMMB called him of her own volition and requested to. This is not the statement of someone who intends to actively facilitate a relationship between AMMB and her father.

Further, the probate court noted that "Bomba has even stated that she feels we wasted a lot of time with this co-guardianship; that the co-guardianship was bad for [AMMB], and even suggested a public guardian." This statement was consistent with Bomba's testimony:

> [A]fter he filed and I saw he went all the way back to the beginning, I knew right then and there he didn't want to do co-guardianship. He wanted to use it to build a case for sole guardianship. So, you know, I feel like it's been wasted time to work with him because he was looking—he was just building a case from the beginning and that's how I felt this whole time.

Finally, Bomba highlights the court's concluding statement, arguing that it was insufficient to facilitate appellate review:

> The Court does still find the conditions that led to the guardianship of [AMMB] still exist today; that she still needs plenary guardian of an individual and her estate, and that a parent should be appointed. The Court looking at the best interest of [AMMB], looking at all the facts including me talking to her, hearing the witnesses, looking at exhibits, considering the willingness and the cooperation that needs to effect [sic] is going to grant the petition of the petitioner and appoint Andrew Bazakis as full guardian, plenary, and remove Christy Bomba as co-guardian.

That isolated comment is not sufficient to facilitate appellate review, but the court made lengthy and detailed findings that included a comprehensive overview of the evidence and the case's history.

## D. MISSING FILES

The probate court took judicial notice of the parties' prior divorce and custody files, but for unknown reasons, there are no records available from November 2007 to September 2014. Bomba has failed to establish that this was the probate court's fault or that she was in any way harmed by this. Bomba pushes a strained argument that this was not harmless because the records would establish that Bazakis was ordered to attend therapy, and this evidence would establish that Bazakis has anger problems. However, this matter can be addressed through the parties'

testimony, and whether Bazakis attended therapy between 2007 and 2014 would have little-to-no bearing on whether he had anger problems as of 2023.

## E.  SUBPOENA OF BAZAKIS'S WIFE

Bomba argues that the probate court erred by quashing the subpoena that Bomba issued to Bazakis's wife, Ann.  We disagree.

On October 10, 2023, Bomba issued a subpoena to Ann Bazakis that requested her to produce communications between Bazakis and Ann related to a trip to Europe in 2023, any communications between Ann and any other person discussing the planned trip, a copy of Ann's passport showing visa stamps or other markings, and Facebook photographs of Ann or her biological daughter in Malta in 2023.  Bazakis moved to quash the subpoena, arguing that the requested items were "overbroad, not relevant, and unduly burdensome."  Specifically, trips taken by a nonparty without AMMB were not relevant, and the requested information was highly personal and could be used for identity theft.  When ruling on the motion, the court found that the demanded information was "irrelevant and far afield from the central issue of suitability before this court."  The request raised issues that would consume time without assisting the determination of a relevant issue.  The court reasoned that the proceeding was about AMMB's best interests and whether the coguardians could put their love for AMMB before their distrust of each other.  Accordingly, it quashed the subpoena.

Bomba has not addressed the basis of the lower court's decision, which was that presentation of the evidence would have wasted time because it was too attenuated from the central issues in the case.  Regardless, the trial court did not abuse its discretion by ruling that this evidence was irrelevant.  Bomba argues that it was relevant to Bazakis's credibility because he stated that the family was planning a trip to Europe that included AMMB, but this evidence would establish that Ann and her daughter already went to Europe without AMMB.  The court did not abuse its discretion because allowing evidence pertaining to an issue so far removed from whether it was in AMMB's best interests for Bazakis to be the sole guardian could open the floodgates to a slew of evidence with only a strained connection to the central issues.[6]

## V.  VEXATIOUS APPEAL

We disagree with Bazakis's characterization of this matter as a vexatious appeal and accordingly decline to sanction Bomba.

---

[6] In her principal brief on appeal, Bomba argues that that the probate court erred by awarding attorney fees to Bazakis after granting his motion for reconsideration because he had not previously requested fees or costs.  We do not review the issue now because the section of Bomba's brief was struck by a previous order of this Court for jurisdictional reasons.  *In re Guardianship of AMMB*, unpublished order of the Court of Appeals, entered February 2, 2024 (Docket No. 368915).

MCR 7.216(C)(1) allows this Court to sanction a party who has engaged in vexatious litigation:

> The Court of Appeals may, on its own initiative or on the motion of any party filed under MCR 7.211(C)(8), assess actual and punitive damages or take other disciplinary action when it determines that an appeal or any of the proceedings in an appeal was vexatious because
>
> (a) the appeal was taken for purposes of hindrance or delay or without any reasonable basis for belief that there was a meritorious issue to be determined on appeal; or
>
> (b) a pleading, motion, argument, brief, document, record filed in the case or any testimony presented in the case was grossly lacking in the requirements of propriety, violated court rules, or grossly disregarded the requirements of a fair presentation of the issues to the court.

There is no indication that Bomba has filed the appeal for the purposes of delay pursuant to MCR 7.216(C)(1)(a). Additionally, Bomba has raised novel issues regarding the propriety of *in camera* interviews of developmentally disabled persons and whether AMMB's presence was required at the hearings, both of which have never been clearly addressed by this Court and could potentially have merit. Bomba's arguments and briefs are not grossly lacking in the requirements of propriety, violative of court rules, or disregarding the fair presentment of issues to this Court. Therefore, sanctions are not warranted.

## VI. CONCLUSION

The probate court's order granting Bazakis's petition to remove Bomba as coguardian and appoint Bazakis as sole guardian is affirmed. Bazakis's request for sanctions is denied. Bazakis, being the prevailing party, may tax costs. See MCR 7.219(A).

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly
/s/ Michelle M. Rick

-14-